**Stanton E. ROSS, Plaintiff/Counter Defendant,**

v.

**Adam ROTHSTEIN, Defendant/Counterclaimant.**

**Case No. 13–2101–DDC–TJJ.**

United States District Court, D. Kansas.

Signed March 12, 2015.

Adam J. Gasper, James F.B. Daniels, McDowell, Rice, Smith & Buchanan, PC, Kansas City, MO, for Plaintiff/Counter Defendant.

Neil L. Johnson, Nicholas L. Divita, Sharon A. Stallbaümer, Berkowitz Oliver Williams Shaw & Eisenbrandt, LLP, Kansas City, MO, for Defendant/Counterclaimant.

## MEMORANDUM AND ORDER

DANIEL D. CRABTREE, District Judge.

This matter comes before the Court on: (1) defendant's Motion for Summary Judgment on plaintiff's claim for wrongful disposition of collateral, defendant's right to a deficiency damages award, and defendant's entitlement to attorney's fees (Doc. 252); (2) plaintiff's Motion for Summary Judgment on plaintiff's claim for wrongful disposition of collateral under K.S.A. §§ 84-9-624 and 84-9-626 and defendant's counterclaim for fraud in the inducement (Doc. 255); and (3) plaintiff's Motion in Limine excluding all facts, evidence, testimony, opinions, and inferences offered by defendant's proffered expert attorney Brian C. Underwood (Doc. 261). The Court referred all three motions to Magistrate Judge Teresa J. James for report and recommendation. On December 23, 2014, Judge James issued her Report and Recommendation (Doc. 283), recommending that the Court grant in part and deny in part plaintiff's Motion in Limine (Doc. 261), grant defendant's Motion for Summary Judgment (Doc. 252), and deny plaintiff's Motion for Summary Judgment (Doc. 255).

Plaintiff filed timely objections to the Report and Recommendation (Doc. 289).[1] After considering plaintiff's objections and defendant's response, and having reviewed Judge James' well-reasoned Report and Recommendation, the Court overrules plaintiff's objections and adopts the Report and Recommendation of Judge James in its entirety.

---

1. Defendant also filed Conditional Objections to the Report and Recommendation (Doc. 286), which he requested the Court to consider only if it rejected Judge James' recommendation that the Court enter summary judgment against plaintiff on plaintiff's claim for wrongful disposition of collateral and in favor of defendant on defendant's claim for a deficiency damages award and determination (Doc. 286 at 1). Because the Court adopts Judge James' Report and Recommendation in its entirety, it need not consider defendant's Conditional Objections. Therefore, the Court overrules defendant's Conditional Objections as moot.

## I. Undisputed Facts

Judge James' Report and Recommendation (hereinafter, "Report") accurately sets forth the undisputed facts of the case. The Court briefly summarizes those facts here.

Plaintiff is a resident of Johnson County, Kansas, and currently the Chairman of the Board, President, Chief Executive Officer, and shareholder of Infinity Energy Resources, Inc. ("Infinity"), a publicly traded company with its principal place of business in Johnson County, Kansas. Defendant is a Connecticut resident and currently the advisor to several funds concentrating in the technology, media, and entertainment sectors.

On March 30, 2012, defendant agreed to loan plaintiff $210,000 for 60 days. The terms of the loan were memorialized in a Secured Promissory Note and Pledge Agreement signed by the parties. The Secured Promissory Note required plaintiff to repay the loan in full within 60 days, on or before May 31, 2012, and to pay the interest on the loan by transferring to defendant 15,000 shares of Infinity stock.

Plaintiff failed to repay the loan by its due date of May 31, 2012. At plaintiff's request, the parties entered into a signed, written Forbearance Agreement on August 27, 2012. Under the Forbearance Agreement, among other things, (1) plaintiff reaffirmed all obligations under the Secured Promissory Note, (2) plaintiff acknowledged the default, and (3) defendant agreed to forbear from taking any remedial action on the Secured Promissory Note based on plaintiff's default until January 1, 2013. As consideration for the Forbearance Agreement, plaintiff agreed to deliver and transfer an additional 50,000 shares of Infinity common stock. When they executed the Forbearance Agreement, the parties entered into a (Superseding) Pledge Agreement in which plaintiff pledged 77,310 shares of Infinity common stock that he owned.

Plaintiff did not repay the loan on or before January 1, 2013, and his failure to repay the loan continues to date.

On January 30, 2013, plaintiff filed this lawsuit in the District Court of Johnson County, Kansas, and defendant removed the action to this Court. On September 9, 2013, Judge Lungstrum, the district judge then presiding over this case, granted summary judgment for defendant on his counterclaims for breach of the Secured Promissory Note, breach of the Forbearance Agreement, and breach of the (Superseding) Pledge Agreement and foreclosure of security interest (Doc. 54). Two days later, Judge Lungstrum entered judgment for defendant on defendant's three breach of contract claims in the total amount of $210,000, plus 18% default interest compounding monthly beginning September 5, 2012 (Doc. 56). Judge Lungstrum also ruled that defendant was entitled to obtain from the Clerk of the Court the original Infinity Energy Resources, Inc. Certificate No. 3287 representing 77,310 shares of Infinity common stock (Doc. 54).

On September 12, 2013, the Clerk of the Court released this stock certificate to defendant, which plaintiff previously had deposited with the Court (Docs. 52, 57). Four days later, defendant deposited the certificate for the 77,310 shares of Infinity common stock in an account with online broker Fidelity.com. He had established this account earlier in 2013, when he sold the 15,000 Infinity shares (that plaintiff had agreed to pay as interest on the loan) and the 50,000 Infinity shares (that plaintiff agreed to pay as additional consideration in the Forbearance Agreement) that defendant previously had received from plaintiff.

Defendant sold the 77,310 shares of Infinity common stock on September 16,

2013. He sold the shares in six different lots at prices ranging from $2.85 per share to $2.99 per share. After deducting brokerage fees and commissions, defendant realized $221,361.91 from the sale of the 77,310 shares.

Infinity's common stock trades on the Over–the–Counter QB Tier Market ("OTCQB") under the symbol "IFNY." Infinity's common stock was not publicly traded or sold on any other stock market in 2012, 2013, or anytime since.

On December 23, 2013, plaintiff filed an Amended Complaint asserting a claim against defendant for Wrongful Disposition of Collateral under K.S.A. § 84–9–625. This amendment relied on defendant's sale of the 77,310 shares of Infinity common stock (Doc. 117 at 10 –11). Plaintiff alleges that defendant violated Kansas law by failing to give plaintiff notice of the impending sale and by selling the shares in a commercially unreasonable manner.

In July 2014, the parties filed cross-motions for summary judgment (Doc. 252, 255) and plaintiff filed a motion in limine to exclude the testimony of defendant's expert, Brian C. Underwood (Doc. 261). Defendant's motion seeks summary judgment against plaintiff's claim for wrongful disposition of collateral and in favor of defendant's right to deficiency damages and attorney's fees (Doc. 252). Plaintiff seeks summary judgment on his claim for wrongful disposition of collateral and against defendant's counterclaim for fraud in the inducement.

## II. Report and Recommendation

The Court referred the motions to Judge James for a report and recommendation (Doc. 282). In the Report issued December 23, 2014 (Doc. 283), Judge James first recommended that the Court grant in part and deny in part plaintiff's motion in limine. Her Report concluded that though Mr. Underwood is qualified to

testify as an expert under Fed.R.Evid. 702, he cannot testify about the four opinions in his affidavit because they are inadmissible legal conclusions. Judge James explained that Mr. Underwood cannot testify about legal opinions, he nonetheless may testify about factual issues that will help the Court decide legal issues. In making her recommendations on the cross-motions for summary judgment, Judge James determined that she could consider the factual statements in Mr. Underwood's affidavit "such as the operation, function, and trading of stocks on over-the-counter securities markets generally, as well as the OTCQB in particular and how it functions, operates, and how stocks trade on the OTCQB," as well as "the details of [defendant's] actual trades of the Infinity shares at issue." (Doc. 283 at 19–20) But Judge James' recommended rulings on the cross-motions for summary judgment nonetheless disregarded Mr. Underwood's legal opinions. (*Id.* at 21)

Next, Judge James recommended that the Court grant defendant's motion for summary judgment for three reasons. First, Judge James recommended summary judgment against plaintiff's claim for wrongful disposition of collateral. She concluded that the undisputed facts establish that plaintiff waived his right to notice of defendant's sale of the 77,310 shares of Infinity common stock and also that defendant had sold the shares in a commercially reasonable manner. Second, Judge James recommended that the Court enter a deficiency damages determination and award for defendant, and if the Court adopted her Report, she recommended the Court set an evidentiary hearing to determine the amount of the deficiency judgment that plaintiff owes to defendant. Third, Judge James recommended that defendant is entitled to recover his reasonable out-of-pocket costs and expenses (including attorney's fees) because the (Superseding) Pledge Agreement requires plaintiff to pay

those costs and expenses. Judge James recommended that the Court determine the amount that defendant is entitled to recover after defendant complies with the fee application process established in Fed. R.Civ.P. 54(d)(2) and D. Kan. Rule 54.2.

Judge James then turned to plaintiff's motion for summary judgment. She recommended ruling against plaintiff's motion for summary judgment for two reasons. First, the same reasons that led her to recommend summary judgment for defendant against plaintiff's wrongful disposition of collateral claim also warranted summary judgment against plaintiff on this same claim. Namely, the undisputed facts establish plaintiff had waived his right to receive notice of defendant's sale of the stock and defendant had sold the stock in a commercially reasonable manner. Second, Judge James recommended summary judgment against defendant's counterclaim for fraud in the inducement because plaintiff filed his motion out of time and genuine factual issues exist that preclude summary judgment.

Plaintiff asserts thirteen objections to Judge James' Report. The Court addresses each objection below.

### III. Standards of Review

■ Under Fed.R.Civ.P. 72(b)(2) and 28 U.S.C. § 636(b)(1)(C), a party may file specific, written objections to a magistrate judge's proposed findings and recommendations. When reviewing a magistrate judge's report and recommendation on a dispositive issue, the Court reviews de novo "those portions of the [magistrate's] report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). This de novo review requires the Court to "consider relevant evidence of record and not merely review the magistrate judge's recommendation." *In re Griego*, 64 F.3d 580, 584 (10th Cir.1995) (citation omitted).

When performing this review, the Court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R.Civ.P. 72(b)(3); *see also* 28 U.S.C. § 636(b).

The standard for deciding summary judgment is well-established. Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that he is "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). When it applies this standard, the Court views the evidence and draws inferences in the light most favorable to the non-moving party. *Nahno–Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir.2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir.2010)).

■ The Court applies this same standard to cross motions for summary judgment. Each party bears the burden of establishing that no genuine issue of material fact exists and entitlement to judgment as a matter of law. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir.2000). Cross motions for summary judgment "are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir.1979). But where the cross motions overlap, the Court may address the legal arguments together. *Berges v. Standard Ins. Co.*, 704 F.Supp.2d 1149, 1155 (D.Kan.2010) (citation omitted).

### IV. Plaintiff's Objections

**A. Objection No. 1—Plaintiff Objects that the Report Found True a Number of Facts Material to Defendant's Fraud in the Inducement Claim.**

■ Plaintiff first objects to the Report's acceptance of several summary

judgment facts that are material to defendant's fraud in the inducement claim. By accepting those facts as true, plaintiff argues, Judge James ignored plaintiff's evidence controverting those facts and thereby engaged in an impermissible weighing of the summary judgment facts.

Plaintiff bases this objection on eight facts Judge James concluded were uncontroverted:

(1) During the parties' initial discussions about the loan, plaintiff said "it would be a very short term loan since his company, Infinity, was moments away from closing on a financing and the company owed him $300,000 in 'back pay.'" (Doc. 283 at 2–3)

(2) Plaintiff "assured [defendant] that he would be able to promptly repay the loan, stating that Infinity was near to closing on a financing from which the $300,000 in 'back pay' Infinity owed him would be funded." (*Id.* at 3)

(3) "At no time during the conversations leading up to [defendant] agreeing to make the loan to [plaintiff] did [plaintiff] tell [defendant] there were substantial tax liens filed against [plaintiff] that would make any compensation payment to [plaintiff] from Infinity subject to being consumed by taxing authorities." (*Id.*)

(4) "At no time during the conversations leading up to [defendant] agreeing to make the loan to [plaintiff] did [plaintiff] tell [defendant] that [defendant] was counting on Infinity entering into a business relationship with a drilling partner that would result in Infinity being able to fund his 'back pay.'" (*Id.*)

(5) "At no time during the conversations leading up to [defendant] agreeing to make the loan to [plaintiff] did [plaintiff] state to [defendant] that [plaintiff] was counting on the value of Infinity's stock to rise, the sale of which would enable him to repay the loan." (*Id.* at 4)

(6) "Before [defendant] funded the $210,000 loan to [plaintiff] on March 30, 2012, [defendant] was never told in any manner by [plaintiff] himself, or by Stephen Gans, or by any Digital Ally Board member, or by anyone else, that [plaintiff] had tax problems and tax liens filed against him." (*Id.*)

(7) "At no time did Mr. [Stephen] Gans hear or otherwise learn from [plaintiff], from any other member of the Digital Ally Board, or from anyone else associated with Digital Ally, that [plaintiff] had problems with the IRS and tax liens filed against him." (*Id.*)

(8) "[Plaintiff] did not repay the Loan on or before the forbearance extended due date, and his failure to repay the Loan continues to this date." (*Id.* at 5)

Defendant set out each of these statements of fact in his Statement of Material Facts supporting his summary judgment motion (Doc. 254 at ¶ 7) or in his Statement of Additional Material Facts filed in response to plaintiff's summary judgment motion (Doc. 267 at ¶¶ 68, 70–73, 76, 79). He properly cited evidence in the record to support each of these factual statements. Plaintiff responded to defendant's statement of fact that "[Plaintiff] did not repay the Loan on or before the forbearance extended due date, and his failure to repay the Loan continues to this date" (No. 8 above) by stating that it was "undisputed." (Doc. 271 at ¶ 7) And plaintiff never responded to the other statements of fact (contained in defendant's Statement of Additional Material Facts in response to plaintiff's summary judgment motion (Doc.

267)), as Fed.R.Civ.P. 56(c)(1) and D. Kan. Rule 56.1 require.[2] Plaintiff did not controvert specifically defendant's Statement of Additional Material Facts in plaintiff's reply (Doc. 280) or in any other document filed with the Court. Thus, Judge James did not err when she accepted these eight facts as uncontroverted and included them in her findings of fact.

■ Plaintiff lists another 30 statements of fact that purportedly controvert the eight statements of fact described above and accepted by Judge James. Plaintiff asserts that Judge James ignored these 30 statements of fact, and, by doing so, she engaged in an impermissible weighing of the summary judgment facts. Plaintiff correctly stated that a court may not weigh competing facts at summary judgment under the well-established standard. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[A]t the summary judgment stage the judge's function is not [ ] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

Plaintiff included the 30 statements of fact (that he claims Judge James ignored) in his Statement of Uncontroverted Material Facts in support of his motion for summary judgment (Doc. 257). Defendant filed a Response to plaintiff's Statement of Uncontroverted Material Facts (Doc. 268). In Doc. 268, defendant responded to each of plaintiff's 30 factual statements by explaining that the majority of these facts either are immaterial, objectionable because they lack foundation or are hearsay, or controverted based on other evidence in the record. Plaintiff did not address defendant's objections to these 30 factual

statements in his reply (Doc. 280) or in any filing with the Court.

In her Report, Judge James set out the statement of facts on which she based her recommendation and explained that these facts were "either uncontroverted, or, where controverted, are construed for summary judgment purposes in the light most favorable to the party opposing the summary judgment motion." (Doc. 283 at 2). She also made clear that "[i]mmaterial facts and factual averments not properly supported by the record are omitted" from her findings of fact. (*Id.* at 2)

The Court has reviewed the factual record cited by plaintiff in support of these 30 factual statements and agrees with Judge James: these 30 factual statements are either immaterial or not supported by the record. Therefore, Judge James did not err by failing to include these factual statements in her findings of fact. Because the Report properly excluded these 30 factual statements from the findings of fact, the Court concludes Judge James did not weigh the summary judgment facts improperly. The Court therefore overrules plaintiff's first objection to the Report.

**B. Objection No. 2—Plaintiff Objects that the Report Erroneously Admits the Factual Testimony of Defendant's Expert While Excluding His Opinions.**

■ In the Report, Judge James recommended that the Court grant in part and deny in part plaintiff's motion in limine seeking to exclude all facts, evidence, testimony, opinions, and inferences offered by defendant's proffered expert attorney, Brian C. Underwood (Doc. 283 at 20–21). Judge James first determined that Mr. Underwood is qualified to testify as an

---

**2.** Fed.R.Civ.P. 56(c)(1) requires a party asserting that a fact is disputed to cite particular parts of the record or to establish a genuine issue; D. Kan. Rule 56.1(b) states that all material facts set forth in the non-moving party's statement of additional facts are deemed admitted unless specifically controverted by the reply of the moving party.

expert under Fed.R.Evid. 702. But having decided the threshold question of expertise, Judge James then concluded that Mr. Underwood cannot testify at trial about the four opinions in his affidavit because they are inadmissible legal conclusions. However, Judge James differentiated between these four legal opinions and factual issues that will assist the Court in deciding legal issues "such as the operation, function, and trading of stocks on over-the-counter securities markets generally, as well as the OTCQB in particular and how it functions, operates, and how stocks trade on the OTCQB," as well as "the details of [defendant's] actual trades of the Infinity shares at issue." (*Id.* at 19–20) Plaintiff objects to the Report's recommendation for two reasons.

First, plaintiff objects that Mr. Underwood cannot testify as a fact witness about these facts because he lacks personal knowledge of the facts, as Fed.R.Evid. 602 requires. But Judge James did not recommend that the Court admit Mr. Underwood's testimony as fact witness testimony under Fed.R.Evid. 602. To the contrary, she determined that Mr. Underwood was qualified to testify as an expert under Fed. R.Evid. 702, which allows a "witness who is qualified as an expert by knowledge, skill, experience, training, or education [to] testify in the form of an opinion *or otherwise.*" Fed.R.Evid. 702 (emphasis added). An expert witness may testify about facts at trial when the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702(a); *see also Specht v. Jensen,* 853 F.2d 805, 809–10 (10th Cir.1988) (holding that expert witness may testify about specific questions of fact to aid the jury's understanding of the facts in evidence); *Hartzler v. Wiley,* 277 F.Supp.2d 1114, 1118 (D.Kan.2003) (excluding expert's opinion testimony that amounted to legal conclusions but allowing expert to testify about facts and circumstances demonstrating the

parties' intent in entering into an ambiguous contract).

Judge James' ruling left Mr. Underwood in a relatively uncommon position for an expert. The Report excluded all his opinions because they amounted to legal opinions—an expertise typically reserved for the Court. But Judge James concluded that Mr. Underwood still possessed other "knowledge, skill, experience, training, or education" that, in Her Honor's estimation, helped understand the evidence. Fed. R.Evid. 702. May an expert in this position still testify about the "non-opinion" aspects of the expert's "knowledge" or "experience"? While plaintiff argues in his objections that Mr. Underwood cannot be permitted to testify about any "facts" that support his properly excluded opinions, plaintiff cites no authority for this argument. (Doc. 289 at ¶ 26, 32) In contrast, the available authority on this issue leads the Court to conclude that Judge James correctly considered Mr. Underwood's "knowledge" about and "experience" with "the operation, function, and trading of stocks on over-the-counter securities markets generally, as well as the OTCQB in particular...." (Doc. 283 at 19–20)

As Judge James recognized, Rule 702(a) empowers a court to consider such evidence. "A witness who is qualified as an expert ... may testify in the form of an opinion or otherwise if: (a) the expert's ... other specialized knowledge will help the trier of fact...." Fed.R.Evid. 702(a). The Rule's Advisory Committee Notes amplify this principle. "Most of the literature assumes that experts testify only in the form of opinions. The assumption is logically unfounded." Fed.R.Evid. 702 advisory committee's note (commenting on the 1972 proposed rules). And the case authorities also reject the idea that opinions are essential to an expert's currency. *See United States v. Mulder,* 273 F.3d 91, 102

(2d Cir.2001) (holding that the government was "free to offer expert testimony ... as background for an offense"); *see also Fisher v. Ciba Specialty Chems. Corp.*, No. 03–0566–WS–B, 2007 WL 2302470, at *2–3 (S.D.Ala. Aug. 8, 2007) (citing, among others, *United States v. Lewis*, 240 F.3d 866, 869–70 (10th Cir.2001) (trial court properly admitted expert testimony to explain general requirements of Oklahoma. law although expert offered no opinions whether that law applied to defendant)). Both *Fisher* and *Lewis* rejected motions seeking to exclude expert witnesses because they offered background information but no opinions.

Here, Judge James did not err by recommending that the Court admit Mr. Underwood's uncontroverted background information even though she had excluded his opinions. Her exclusion ruling did not nullify Mr. Underwood's qualifications. And Rule 702 permits a court to consider such testimony—here by Affidavit—as does the commentary of the advisory committee and the cases applying the rule.

Plaintiff also objects that defendant never disclosed Mr. Underwood as a fact witness. Defendant points out that plaintiff did not raise this argument in his original motion (Doc. 261), and, therefore, the Court should not consider it. Nevertheless, the Court reiterates that Judge James did not recommend that the Court treat Mr. Underwood as a fact witness but instead found Mr. Underwood qualified to testify as an expert about these factual issues. Defendant properly disclosed Mr. Underwood as an expert witness (Doc. 162), and thus plaintiff's argument that the Court should exclude Mr. Underwood's testimony for failing to disclose him lacks merit.

Next, plaintiff argues that Mr. Underwood's factual testimony is based on hearsay and therefore is inadmissible under Fed.R.Evid. 703,[3] unless the evidence's probative value outweighs its prejudicial effect. Plaintiff argues, without specificity, that the facts which Mr. Underwood relies on "consist entirely of something he has read or heard" and thus constitute hearsay. (Doc. 289 at ¶ 34) The Court, however, has reviewed Mr. Underwood's affidavit (Doc. 253–3) and agrees with defendant: Mr. Underwood's affidavit provides sufficient foundation for his specialized knowledge about over-the-counter markets, including the OTCQB. The Court therefore overrules plaintiff's second objection to the Report.

**C. Objection No. 3—Plaintiff Objects to the Report's Acceptance of Certain Factual Testimony Provided by Mr. Underwood That Plaintiff Claims Is Contradicted By Other Evidence in the Record.**

Like the arguments made by his first objection, plaintiff argues that Judge James erred by accepting as true certain factual testimony of Mr. Underwood because other evidence in the record contradicts this factual testimony. By doing so, plaintiff argues, Judge James improperly weighed the evidence on summary judgment. The Court rejects this argument for several reasons.

First, plaintiff lists eight pieces of "factual testimony" that the Report purportedly "admits, credits and adopts" and this "in

---

**3.** *Fed.R.Evid. 703 provides: "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible* for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."

some instances violat[es] the exclusion of rulings elsewhere in the Report." (Doc. 289 at ¶ 36 (noting, in particular, the Report's ruling that the Court cannot accept Mr. Underwood's legal conclusion that the OTCQB is a "recognized market" as defined under the Kansas Uniform Commercial Code)) The Court has reviewed the eight factual statements and finds that Judge James did not err by including them in her Report. Several of these statements address Mr. Underwood's qualifications to testify as an expert and Judge James' determination that he has the requisite skill, experience, and knowledge to testify as an expert about certain factual matters. The Court again has reviewed Mr. Underwood's education, training, and other professional background, as set out in his affidavit, and agrees with Judge James. Mr. Underwood is qualified to testify as an expert under Fed.R.Evid. 702.

The other statements include facts taken from Mr. Underwood's affidavit that describe the operation, function, and trading of stocks on over-the-counter securities markets, including the OTCQB. Defendant included some of these facts in his Statement of Material Facts in support of his summary judgment motion, citing Mr. Underwood's affidavit to support these facts (Doc. 254 at ¶¶ 31–39). Plaintiff responded that many of these facts were undisputed, or, where disputed, plaintiff failed to controvert the facts with admissible evidence in the summary judgment record (Doc. 271 at ¶¶ 31–39). Defendant presented additional factual testimony from Mr. Underwood's affidavit in his Statement of Additional Material Facts filed in response to plaintiff's summary judgment motion (Doc. 267 at ¶¶ 48–56). As explained above, plaintiff never responded to these factual statements—not in plaintiff's reply (Doc. 280) or in any other document filed with the Court. The Court thus concludes that Judge James did not err when she accepted Mr. Under-

wood's factual testimony as uncontroverted.

Second, plaintiff argues that Judge James erred by accepting a statement made in Mr. Underwood's affidavit that "the sale of Infinity shares traded on the OTCQB 'were sold in a recognized market at standardized prices; and that the sale of the shares [was] not the subject of individual negotiation.'" (Doc. 283 at 35 (quoting Mr. Underwood's Affidavit (Doc. 253-3 at ¶ 41))) Plaintiff contends that this statement of fact contradicts the Report's other ruling that it cannot accept Mr. Underwood's legal conclusion that the OTCQB is a "recognized market," as defined by the Kansas Uniform Commercial Code ("UCC"). The Court disagrees. The Report never adopted Mr. Underwood's statement that the sale of Infinity shares traded on the OTCQB were sold in a recognized market at standardized prices. Instead, the Report just described what Mr. Underwood had stated in his affidavit; it did not make any explicit finding about his statement or accept it as true. (Id.)

Reading further in the Report, Judge James again stated that she "rejects the ultimate conclusions offered by [Mr. Underwood]," but she found "that his factual statements and explanations support the conclusion that the Infinity shares at issue were sold at standardized prices and the sale of those shares was not subject to individual negotiation." (Id. at 36) Judge James also noted that plaintiff had not offered any evidence to refute Mr. Underwood's statements that defendant's sale of the Infinity shares did not result from individually negotiated transactions. (Id.) Based on this finding, Judge James rejected plaintiff's argument that the OTCQB was not a "recognized market" under the Kansas UCC because the share prices are subject to negotiation. Contrary to plaintiff's argument, Judge James did not accept Mr. Underwood's testimony that de-

fendant's sale of Infinity stock on the OTCQB was sold in a recognized market as the Kansas UCC defines that term. To the contrary, Judge James specifically rejected Mr. Underwood's legal conclusions. (*Id.*)

Finally, plaintiff asserts that the Report ignored contrary evidence in the summary judgment record when it accepted Mr. Underwood's factual testimony as true. By ignoring that contradictory evidence, plaintiff argues, Judge James improperly weighed the summary judgment evidence and violated the established standard for deciding summary judgment. Plaintiff objects that Judge James ignored five types of evidence that contradicted Mr. Underwood's testimony.

*First,* plaintiff argues that Judge James erred by disregarding ten factual statements about the operation of the OTCQB. (*See* Doc. 289 at ¶ 50(a)-(j)) On summary judgment, plaintiff supported each of these factual statements by reference to two screen prints from the OTC Markets Group website. Defendant objected to these website screen prints as inadmissible hearsay. Defendant also argued that even if the website screen prints were admissible, the information that they contained did not controvert facts establishing that the OTCQB operates as a stock market where fungible marketable securities are: (a) traded publicly; and (b) the securities' prices are determined primarily through standardized real-time price quotations and neutral market forces.

In the Report, Judge James explicitly addressed the website screen prints, questioning "the authenticity and admissibility of the statements contained" in them.

(Doc. 283 at 33 (citing *ColtTech LLC v. JLL Partners, Inc.,* 538 F.Supp.2d 1355, 1357 n. 3 (D.Kan.2008) ("For purposes of summary judgment, the court does not consider unsworn, unauthenticated documents, including printed copies of web sites."))) And putting aside the admissibility of this evidence, the information from the website screen prints did not establish that the OTCQB differed from other "recognized" securities markets because the prices of securities traded on the OTCQB are individually negotiated, which, plaintiff argued, demonstrates that the Court should not consider the OTCQB as a "recognized market" under Kansas law. (*Id.*) Judge James noted that one of the screen prints "actually states that investors in OTCQB marketplaces can buy and sell securities 'in a manner almost identical to that of trading NYSE or NASDAQ securities, through the broker of their choice (institutional, online, retail)' " and another of the screen prints "states that 'trading an OTCQX, OTCQB or OTC Pink security is comparable to trading a security on NYSE or NASDAQ. Investors may buy and sell securities through the institutional, online or retail broker-dealer of their choice.' " (*Id.* (quoting Docs. 272–5, 272–6)) The second screen print also "provides a detailed explanation of the trading process for an individual investor." (*Id.*)

The Court has reviewed the factual statements cited by plaintiff and agrees with Judge James. The admissibility of the screen prints used to support plaintiff's purported facts is questionable. The proffered evidence is hearsay, and, on summary judgment, plaintiff did not identify any hearsay exception that would allow the Court to consider this evidence.[4] *See Argo*

---

4. Plaintiff argues in Objection No. 4 below that the evidence is not hearsay because defendant manifested an adoption or belief in the truth of the statements contained on the website. *See* Fed.R.Evid. 801(d)(2)(B). In support of his assertion, plaintiff argues that

defendant attached copies of screen prints from the same website to a motion to review Magistrate Judge Waxse's decision to allow plaintiff to amend his complaint (Doc. 126), defendant's expert relied on information from this website in his expert report (Doc. 253–3),

*v. Blue Cross · and Blue Shield of Kan., Inc.,* 452 F.3d 1193, 1199 (10th Cir.2006) (the content and substance of summary judgment evidence must be admissible at trial); *see also Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000) ("Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment[.]"). The Court also agrees that even if these facts were admissible, they do not establish that the OTCQB differs from other recognized markets because the prices of securities sold on the OTCQB are subject to individual negotiation.

*Second,* plaintiff argues that the Report improperly ignores certain factual statements taken from an August 17, 2007 letter sent to the Securities and Exchange Commission ("SEC") by Cromwell Coulson, who was then the CEO of Pink Sheets, LLC and now is the President of OTC Markets Group. In the summary judgment briefing, defendant objected to this letter because it contained hearsay, was not previously produced in the litigation, was not cited in plaintiff's First Amended Complaint, or identified in any Rule 26 disclosure. (Doc. 278 at 41–43) Defendant. also objected that plaintiff neither had designated Mr. Coulson as an expert witness nor identified him as a fact witness under Rule 26. *(Id.)*

■ Judge James did not refer specifically to this August 17, 2007 letter in her Report, but Judge James did announce

that she had omitted all "factual averments not properly supported by the record." (Doc. 283 at 2) Plaintiff argues that this letter is a public document available for inspection on the SEC's website and the EDGAR system, but he cites no authority that would allow the Court to take judicial notice of this letter under Fed.R.Evid. 201. A court may take judicial notice of evidence "only if the facts in question are 'not subject to reasonable dispute;' if, instead, they are 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *Lozano v. Ashcroft,* 258 F.3d 1160, 1165 (10th Cir.2001) (quoting Fed. R.Evid. 201(b) and citing *United States v. Burch,* 169 F.3d 666, 672 (10th Cir.1999)). Plaintiff has failed to show that the contents of the August 17, 2007 letter are "not subject to reasonable dispute" or that they are "capable of accurate and ready determination" from sources "whose accuracy cannot reasonably be questioned." Thus, the Court declines to take judicial notice of this letter. Moreover, Judge James properly excluded the August 17, 2007 letter because it was inadmissible on summary judgment for all of the additional reasons asserted by defendant and described above.

*Third,* plaintiff asserts that Judge James erred by failing to consider facts from two screen prints purportedly taken from the OTC BB website. (*See* Doc. 289 at ¶ 52) Like the other website screen

---

and defendant admitted that certain information appears on this website (Doc. 268 at ¶¶ 30–36, 48–59). But, upon closer examination of those filings, defendant's references to the website were made in response to plaintiff's citation of the website in his First Amended Complaint (Doc. 117). Moreover, defendant's admission that certain statements appear on a website does not establish that he manifested a belief in the truth of those statements to bring them within the hearsay exception of Fed.R.Evid. 801(d)(2)(B). To the

contrary, defendant specifically stated in his Answer that he was not admitting to the factual accuracy, completeness, or admissibility of the quoted excerpts from the website and defendant continued to object to the admissibility of the statements in the summary judgment briefing. (*See, e.g.,* Doc. 268 at ¶ 30) Thus, the Court rejects plaintiff's assertion that defendant manifested a belief in the truth of the statements on these screen prints to bring the evidence within the hearsay exception.

prints described above, defendant objected to the OTC BB website screen prints as inadmissible hearsay. Defendant also argued that even if the website screen prints were not hearsay, the information contained in them did not controvert facts cited by defendant describing the operation of the OTCQB. Again, the Report does not discuss the OTC BB website screen prints explicitly, but Judge James disregarded this information on summary judgment. The Court concludes that Judge James did not err by failing to consider these screen prints. For the same reasons discussed above, the information contained in these website screen prints is inadmissible hearsay, which the Court cannot consider on summary judgment. *See Argo,* 452 F.3d at 1199; *see also Adams,* 233 F.3d at 1246. The Court also agrees that, even if the facts contained in these website screen prints are admissible, they do not controvert the admissible and properly supported factual statements describing the OTCQB's operation cited by plaintiff.

*Fourth,* plaintiff objects that Judge James failed to consider certain statements contained in FINRA Rule 220.01 (Supplementary Material) which, plaintiff contends, shows that prices on the OTCQB are negotiable. On summary judgment, defendant objected to plaintiff's citation of this supplementary material because it is hearsay, misleading, incomplete, and lacks foundation. Defendant also pointed out that the rule's actual language (as opposed to the supplementary material) describes the OTC standardized price quotation system and the process that prevents member dealers from "backing away" from quotes, thereby controverting the selected statements cited by plaintiff in the supplemental material. (Doc. 278 at 40–41) The Court agrees with defendant. Plaintiff failed to establish that this supplemental material is admissible on summary judgment, and, even if admissible, it does not

controvert other facts describing the OTCQB's price quotation system. Therefore, Judge James did not err by refusing to consider on summary judgment these certain statements contained in FINRA Rule 220.01 (Supplementary Material).

*Fifth,* plaintiff argues that Judge James erred by failing to consider statements made on an SEC website about the sale of OTC securities. Defendant again objected to these facts on summary judgment because plaintiff had failed to establish that information from this government website is admissible without a sponsoring witness or some other basis for admissibility. Defendant also objected that the information was incomplete and therefore misleading. Defendant cited other information from the website confirming that the OTC Link (the trading platform) facilitates trading on the OTCQB based on standardized price quotations, thereby contradicting the selected information cited by plaintiff trying to establish that OTCQB prices are subject to negotiation. Defendant also objected to the statement that the OTC Link provides subscribers the ability to send and receive trade messages, allowing them to communicate for the purpose of negotiating trades, as immaterial. Defendant argued no evidence exists showing that defendant had any such communications to negotiate the sale of shares at issue in this case and the evidence establishes that the sale was transacted electronically at then-prevailing market prices in the best bid/best offer process.

Judge James specifically considered the fact that the OTC Link allows communications and trade negotiations among broker-dealers for possible private transactions of common stock shares of a publicly traded company. (Doc. 283 at 35) But she disagreed that this feature required the Court to conclude that the OTCQB is not a "recognized market" under the Kansas

UCC. (*Id.*) Judge James noted that private parties always have the ability to negotiate private transactions outside of a recognized market. (*Id.*) Moreover, that kind of individual negotiation did not occur with the sale of shares at issue here. (*Id.* at 36) Instead, Judge James determined that the undisputed facts establish that defendant's sale of the Infinity shares in this case was consistent with public trading on the NYSE. (*Id.*)

The Court agrees with Judge James' consideration of the governing facts pertinent to the operation of the OTCQB. She did not weigh facts but, instead, considered the information as a whole in reaching certain conclusions about the operation of the OTCQB and, more specifically, about the sale of the Infinity shares on that market in this case.

*Last,* plaintiff asserts that Judge James erred by failing to consider 15 factual statements which, plaintiff claims, are admissions made in defendant's deposition that demonstrate that the OTCQB is not a "recognized market" under the UCC. (Doc. 289 at ¶ 55) On summary judgment, defendant objected to most of these factual statements because they were misleading or incomplete citations from defendant's deposition testimony about the OTCQB's operation. Defendant responded that certain testimony was uncontroverted to the extent defendant was testifying as a lay witness, but he also referred to more accurate, complete, and admissible facts about the OTCQB's operation as described by defendant's expert, Mr. Underwood. The Court agrees with defendant that plaintiff's purported facts rely on incomplete statements taken from defendant's deposition in which he was testifying about a topic only in a lay witness capacity and not as an expert. These factual statements do not controvert the other evidence cited by defendant describing the OTCQB's operation. Therefore, Judge James did not err by failing to consider these alleged admissions from defendant's deposition testimony.

For all these reasons, the Court concludes that Judge James properly considered the summary judgment record. Judge James did not weigh conflicting evidence. Instead, she determined correctly that the Court could not consider certain evidence—evidence that plaintiff contends contradicts Mr. Underwood's testimony—because plaintiff's proffered evidence is inadmissible, immaterial, or not supported by the summary judgment record. Thus, the Court overrules plaintiff's third objection to the Report.

**D. Objection No. 4—Plaintiff Objects to Judge James' Questioning of the Authenticity and Admissibility of Website Screen Prints Proffered by Plaintiff.**

As discussed above, plaintiff relied on several statements taken from screen shot prints off of the OTC Markets Group's website to controvert defendant's description of the OTCQB's operation. Judge James questioned the authenticity and admissibility of the screen prints from the OTC Markets Group Website. But she also concluded that, if they were admissible, the information did not establish that the OTCQB differs from other "recognized" securities markets because the prices of securities traded on the OTCQB are individually negotiated. (Doc. 283 at 33)

In his fourth objection, plaintiff argues that Judge James erred by questioning the authenticity and admissibility of this evidence. Plaintiff claims that this evidence is admissible and that Judge James erred by failing to consider it on summary judgment. The Court already has addressed the admissibility of the statements from this website above, concluding they are hearsay and not subject to the hearsay

exception in Fed.R.Evid. 801(d)(2)(B). The Court also rejects plaintiff's argument that defendant and his expert relied on statements from this same website. Instead, the record shows that defendant and his expert referred to statements from this website *in response to plaintiff's citations* to this website in his First Amended Complaint (Doc. 117).

More important to this objection, however, plaintiff ignores that Judge James *did* consider the evidence from the screen prints. Her Report specifically states, *"[e]ven setting aside the admissibility of these screen prints,* the Court finds the information in them does not support [plaintiff's] position that the OTCQB is distinguishable from other 'recognized' securities markets because the prices of OTCQB securities are individually negotiated, and therefore the OTCQB should not be considered a 'recognized market' under K.S.A. 84–9–627(b)(1) or (2)." (*Id.* (emphasis added)) Judge James specifically referenced other statements in the screen prints that supported defendant's argument that the OTCQB operates in a manner comparable to trading a security on the NYSE or NASDAQ. Thus, Judge James concluded that the information in the screen prints failed to establish plaintiff's assertion that the OTCQB is different from other recognized markets. Judge James did not err in her consideration of this evidence.

**E. Objection No. 5—Plaintiff Objects that the Report Failed to Require Defendant to Meet His Burden Under K.S.A. § 84–9–626 of Proving that the Collection, Enforcement, Disposition, and Acceptance of the Collateral Complied with Kansas Law.**

K.S.A. § 84–9–626 applies to an action, like this one, that "aris[es] from a transaction in which the amount of a deficiency or surplus is in issue." The statute requires a secured party to bear the burden of establishing "that the collection, enforcement, disposition, or acceptance [of collateral] was conducted in accordance with [Part 6 of Kansas UCC Article 9, K.S.A. §§ 84–9–601 through 628]." K.S.A. § 84–9–626(2). The statute also provides:

> [I]f a secured party fails to prove that the collection, enforcement, disposition, or acceptance was conducted in accordance with [the statutory requirements], the liability of a debtor or a secondary obligor for a deficiency is limited to an amount by which the sum of the secured obligation, expenses, and attorney fees exceeds the greater of:
>
> (A) The proceeds of the collection, enforcement, disposition, or acceptance; or
>
> (B) the amount of proceeds that would have been realized had the noncomplying secured party proceeded in accordance with the provisions of this part relating to collection, enforcement, disposition, or acceptance.

K.S.A. § 84–9–626(3). K.S.A. § 84–9–626(4) explains that "the amount of proceeds that would have been realized is equal to the sum of the secured obligation, expenses, and attorney fees unless the secured party proves that the amount is less than that sum."

Plaintiff argues that the Report failed to hold defendant to this statutory burden on summary judgment. The Court disagrees. As described in more detail below in response to plaintiff's sixth, seventh, eighth, ninth, and tenth objections, Judge James properly applied this statutory burden to the deficiency claim on summary judgment. The Report concluded that no genuine issues of material fact exist to demon-

strate that defendant failed to comply with Part 6 of Article 9 of the Kansas UCC in the collection, enforcement, disposition, or acceptance of the collateral, and therefore, Judge James recommended that the Court grant summary judgment for defendant and against plaintiff on this claim.

Plaintiff argued on summary judgment that defendant failed to comply with the requirements of Kansas law because defendant failed to give plaintiff notice of the sale of 77,310 shares of Infinity stock, failed to obtain a waiver of notice after default, and failed to sell the collateral in a commercially reasonable manner. First, Judge James concluded that, although defendant did not give notice to plaintiff of the sale, as K.S.A. § 84–9–611 requires, defendant established that plaintiff had waived notice in a post-default agreement making notice unnecessary under K.S.A. § 84–9–624(a). (Doc. 283 at 26–28) Second, Judge James determined that defendant had established as a matter of law that his disposition of the collateral was commercially reasonable as K.S.A. §§ 84–9–610 and 84–9–627 require. (*Id.* at 29–38) Thus, Judge James concluded that the summary judgment facts establish that defendant had complied with Part 6 of Article 9. Therefore, the Report recommended that defendant was entitled to summary judgment on plaintiff's claim for wrongful disposition of collateral and a deficiency damages determination award. (*Id.*)

The Report properly applied the statutory burden. *See, e.g., Raytheon Aircraft Credit Corp. v. Mi–Ka Aviation, Inc.,* No. 01–1339–WEB, 2003 WL 21496865, at *5 (D.Kan. May 5, 2003) (granting summary judgment against a debtor who was liable for a debt due under a promissory note because, among other things, no evidence existed showing that the creditor disposed of the collateral in violation of the Kansas UCC); *United States v. Cox,* 731 F.Supp. 1023, 1025–26 (D.Kan.1990) (granting summary judgment against a debtor's claim that a secured creditor violated the Kansas UCC because the "evidence clearly show[ed]" that the sale of collateral was conducted in a commercially reasonable manner); *Gillenwater v. Mid–American Bank and Trust Co.,* 19 Kan.App.2d 420, 870 P.2d 700, 703–04 (1994) (holding that the trial court did not err in granting summary judgment against a debtor's claim that the secured creditor sold collateral in a commercially unreasonable manner). Judge James concluded that defendant met his burden under K.S.A. § 84–9–626(2) to establish that his collection, enforcement, disposition, or acceptance of the collateral complied with Part 6 of Article 9 of the Kansas UCC. The Report thus did not need to address K.S.A. § 84–9–626(3) which provides a formula for determining the debtor's liability, but only if the secured party fails to prove that the collection, enforcement, disposition, or acceptance followed the statutory requirements. That statute does not apply here because the uncontroverted facts establish that defendant complied with the requirements contained in Part 6 of Article 9 of the Kansas UCC.

The Court recognizes that the Report speaks in terms of defendant's proof. (*See* Doc. 37 ("The Court thus finds that [defendant] has sufficiently proven that his deposition of the … stock was conducted in accordance with … Part 6 of Kansas UCC Article 9.")) The Court understands this language to communicate Judge James' ruling that the uncontroverted facts establish that defendant sold the stock in compliance with the Kansas UCC's requirements. To verify, the Court has conducted an independent review of

the relevant undisputed facts and concludes that they establish this proposition as a matter of law. The Court overrules plaintiff's fifth objection to the Report.

**F. Objection Nos. 6 and 7—Plaintiff Objects to the Report's Conclusion that Plaintiff Waived the Notice Requirement After Default Because (1) the Waiver of Notice in the (Superseding) Pledge Agreement is not a Post–Default Waiver as Defined By K.S.A. § 84–9–624(a), and (2) Even if the (Superseding) Pledge Agreement Contains a Waiver of Notice, the Waiver Does Not Include Notices of Sale.**

Plaintiff's sixth and seventh objections argue that the Report erred by concluding that plaintiff waived notice of defendant's sale of the Infinity stock. Plaintiff objects to the Report's conclusion for two reasons.

First, plaintiff contends that the waiver contained in the (Superseding) Pledge Agreement is not a waiver as defined by K.S.A. § 84–9–624(a) because plaintiff did not agree to the waiver after default. K.S.A. § 84–9–624(a) provides that a debtor may "waive the right to notification of disposition of collateral ... only by an agreement to that effect entered into and authenticated *after default*." *Id.* (emphasis added). Plaintiff argues that the (Superseding) Pledge Agreement (which contains the waiver provision) extended the due date of the loan to January 1, 2013, and, therefore, when plaintiff signed that Agreement on August 27, 2012, he was not in default on the loan.

■ The Report rejected plaintiff's argument, and the Court agrees with this conclusion. Kansas law requires the Court, when considering a contract that is unambiguous and whose language is not doubtful or obscure, to give the contract's words "their plain, general and common meaning" and to enforce the contract "according to its terms." *Wagnon v. Slawson Exploration Co., Inc.*, 255 Kan. 500, 874 P.2d 659, 666 (1994) (citations omitted). Applying the laws governing contract interpretation in Kansas, Judge James properly construed the plain and unambiguous language in the parties' contracts.

■ It is undisputed that plaintiff defaulted on the Secured Promissory Note on May 31, 2012. Therefore, when plaintiff entered into the (Superseding) Pledge Agreement on August 27, 2012, he had defaulted already on the loan. Contrary to plaintiff's argument, the (Superseding) Pledge Agreement and Forbearance Agreement (which the parties also executed on August 27, 2012) did not extend the loan's maturity date to January 1, 2013. Instead, defendant agreed in the Forbearance Agreement not to take any remedial action on the Secured Promissory Note based on plaintiff's default until January 1, 2013. Plaintiff also specifically acknowledged in the Forbearance Agreement that the maturity date of the loan was May 31, 2012, that he had failed to pay defendant the amount owed on the loan by that date, and that he was in default. Plaintiff also agreed in the Forbearance Agreement that defendant was not waiving any of his rights or remedies under the Secured Promissory Note, including his rights upon plaintiff's default. Thus, plaintiff's execution of the (Superseding) Pledge Agreement (which included the waiver of notice) occurred after default, as K.S.A. § 84–9–624(a) requires.

Second, plaintiff argues that the waiver of notice provision in the (Superseding) Pledge Agreement contains an exception for notices of sale. Paragraph 12.1 of that

Agreement states that defendant "without notice except as specified below, [may] sell the Pledged Collateral or any part thereof at a commercially reasonable price or prices and upon such other terms as [defendant] deems reasonable." (Doc. 253–9 at ¶ 12.1) Plaintiff asserts that the "except as specified below" language refers to paragraph 17, which requires that "[a]ll notices ... including any ... notice of sale ... shall be in writing" and served in a particular manner. (*Id.* at ¶ 17) Therefore, plaintiff contends, the Agreement required defendant to give plaintiff notice of the sale of Infinity shares in writing and deliver the notice in the manner specified by paragraph 17.

The Court has reviewed the cited language in the (Superseding) Pledge Agreement and agrees with Judge James' interpretation of these two provisions. The language of paragraph 12.1 is both plain and unambiguous. It states that defendant may sell the collateral "without notice except as specified below" but the Agreement contains no exceptions immediately following that paragraph or anywhere else in the Agreement. The requirements contained in paragraph 17 do not create an exception to the waiver of notice in paragraph 12.1. Instead, the language in paragraph 17 merely sets out the requirements for providing notice under the Agreement if such notice is required. But there is no provision in the Agreement requiring notice of the sale; rather, plaintiff specifically waived notice in paragraph 12.1. In sum, then, Judge James did not err when she decided that the undisputed facts show that plaintiff had waived his right to notice of the sale of Infinity stock. The Court overrules plaintiff's sixth and seventh objections to the Report.

**G. Objection Nos. 8, 9, and 10—Plaintiff Objects to the Report's Conclusion that the Sale of Infinity Stock was "Commercially Reasonable" Because (1) the Report Improperly Disregarded or Weighed the Summary Judgment Evidence in Reaching this Conclusion; (2) Defendant Failed to Preserve the Value of the Stock by Selling in the Manner That He Did, and, Thus, He Could Have Received More Value From the Sale; and (3) the Report Failed to Consider Defendant's Admissions Proving that the OTCQB is Not a "Recognized Market."**

With his eighth, ninth, and tenth objections, plaintiff argues that the Report erred by concluding that defendant sold the Infinity stock in a commercially reasonable manner. Plaintiff asserts that the Report's conclusion is wrong for three reasons.

First, plaintiff argues that the Report failed to consider 11 factual statements about how defendant sold the Infinity shares in different lots through an online broker dealer. (Doc. 289 at ¶ 110) In the summary judgment briefing, defendant responded to these factual statements by stating that they were unconverted, but, in some instances, they were incomplete or immaterial. (Doc. 268 at ¶¶ 61–71) For a full description of the manner in which defendant sold the shares, defendant referred to his affidavit. (Doc. 253–2) The Court has reviewed the facts submitted by the parties on summary judgment and determines that the Report states the undisputed and material facts accurately, as supported by the complete summary judgment record, to describe defendant's sale of the Infinity stock. (*See* Doc. 283 at 7–9) Indeed, the Report includes several of the facts listed among the 11 factual statements that plaintiff claims "were not men-

tioned, discussed or considered" in the Report. (Doc. 289 at ¶ 110) Other statements that the Report "failed" to include are immaterial, and Judge James specifically stated in her findings of fact that she had omitted immaterial facts. (Doc. 283 and 2) The Report's consideration of these 11 factual statements was not erroneous.

■ Second, plaintiff asserts that defendant failed to use reasonable care in the custody and preservation of the collateral. Specifically, plaintiff claims that, by selling the stock in the manner that he did, defendant received less value for the stock than he could have generated otherwise. K.S.A. § 84-9-207(a) imposes a duty of care on a secured party by requiring it to "use reasonable care in the custody and preservation of collateral in the secured party's possession." The "preservation of collateral" requirement in this statute " 'includes preservation of value.' " *In re Krug,* 189 B.R. 948, 960 (Bankr.D.Kan. 1995) (quoting *Reed v. Cent. Nat'l Bank of Alva,* 421 F.2d 113, 117 (10th Cir.1970)). Plaintiff argues that defendant failed to preserve the value of the Infinity stock by selling it in less than 40 minutes on the morning of September 16, 2013. Plaintiff contends that had defendant waited even a few hours, when the stock was trading at a higher price, he would have generated thousands of dollars more in his sale of the collateral.

But the Kansas UCC also provides that "[t]he fact that a greater amount could have been obtained by ... disposition ... at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the ... disposition ... was made in a commercially reasonable manner." K.S.A. § 84-9-627(a). Several courts outside of Kansas, interpreting this same provision of the UCC, have reached the same conclusion. *See, e.g., Layne v. Bank One, Ky., N.A.,*

395 F.3d 271, 280 n. 9 (6th Cir.2005) (recognizing that the shares were highly volatile, and it was not commercially unreasonable for the secured party to delay the sale because the price could have rebounded); *Federal Deposit Ins. Corp. v. Air Atlantic, Inc.,* 389 Mass. 950, 452 N.E.2d 1143, 1147 (1983) (although the debtor argued that the secured party retained the collateral during a time when the market declined "ruinously," "no exception is made [in § 9–627] for serious and notorious market declines.").

Here, the Report did not err by concluding that defendant's sale of the Infinity stock was made in a commercially reasonable manner. While plaintiff has the benefit of hindsight, defendant had no such luxury. K.S.A. § 84-9-627(a) specifically provides that a "greater amount opportunity" does not preclude the Court from finding that the secured party disposed of the collateral in a commercially reasonable manner. For all of the reasons cited in the Report, Judge James did not err by concluding that defendant's sale of the collateral was made in a commercially reasonable manner.

Third, plaintiff argues that the Report erred by failing to consider defendant's admissions about the operation of the OTCQB, which, plaintiff claims, prove that the OTCQB is not a "recognized market" under the Kansas UCC. The Court already has addressed this argument above. *See supra* Part IV.C. While plaintiff argues that defendant made certain admissions about the OTCQB's operation, plaintiff's descriptions of these alleged admissions are incomplete. Reviewing the summary judgment record as a whole, including the facts describing the OTCQB's operation by defendant's expert, Mr. Underwood, the Report correctly considered the undisputed facts describing the OTCQB's operation and properly determined from those undis-

puted facts that the shares of Infinity stock were sold at standardized prices and were not the subject of individual negotiation. Thus, the Report did not err by concluding that the shares of Infinity stock were sold on a "recognized market" and that defendant's sale was commercially reasonable under K.S.A. § 84–9–627(b).

**H. Objection Nos. 11 and 12—Plaintiff Objects to the Report's Conclusion that Defendant is Entitled to Attorney's Fees Under the (Superseding) Pledge Agreement, But Even if Defendant Is So Entitled, Plaintiff Argues That The Court Must Limit the Recovery of Fees to the "Reasonable Costs of Collection" Under K.S.A. § 58–2312.**

Plaintiff objects to the Report's conclusion that defendant is entitled to recover attorney's fees under the (Superseding) Pledge Agreement. Plaintiff advances two objections to the Report's conclusion.

First, plaintiff argues that the Report erred in concluding that no genuine issues of material fact exist to preclude defendant's recovery of attorney's fees under the (Superseding) Pledge Agreement. The Court agrees with the Report's conclusion. Paragraph 11 of the Secured Promissory Note requires plaintiff to pay defendant's costs of collection, including reasonable attorney's fees and all costs of suit, including "in the event [defendant] is made party to any litigation because of the existence of the indebtedness evidenced by this Note...." (Doc. 253–6 at ¶ 11) In addition, Paragraph 14 of the (Superseding) Pledge Agreement requires plaintiff to pay "all reasonable out of pocket expenses" incurred by defendant "in connection with any matters contemplated by or arising out of this Pledge Agreement" including costs and expenses incurred in defending

plaintiff's claims against defendant. (Doc. 253–9 at ¶ 14) Judge James correctly concluded that the plain language of the parties' contracts require plaintiff to pay defendant's reasonable attorney's fees, and she properly recommended that the fee application process established by Fed. R.Civ.P. 54(d)(2) and D. Kan. Rule 54.2 shall govern the Court's determination of that amount.

Second, plaintiff argues that the Court should amend the Report to make clear that defendant's recovery of attorney's fees is confined to "reasonable costs of collection," as defined by K.S.A § 58–2312. The Court disagrees. This statute does not limit defendant's recovery just to the "reasonable costs of collection." Instead, K.S.A. § 58–2312 provides that "any note, mortgage or other credit agreement may provide for the payment of reasonable costs of collection, including, but not limited to, court costs, *attorney fees* and collection agency fees...." *Id.* (emphasis added).[5] The Kansas Court of Appeals has held that this statute does not limit the recovery of attorney's fees under a note to collection actions. *Santa Rosa KM Assocs., Ltd. v. Principal Life Ins. Co.,* 41 Kan.App.2d 840, 206 P.3d 40, 53 (2009). To the contrary, *Santa Rosa* held that by enacting the current language in the statute, the Kansas Legislature "lift[ed] the blanket prohibition [on recovery of attorney's fees] and restor[ed] freedom of contract to parties to negotiate on the issue of attorney fees, particularly in a commercial context...." *Id.*

Even after *Santa Rosa,* plaintiff argues, Kansas law does not allow the recovery of attorney's fees when the secured party's "defense of 'counterclaims [does] not entail proof or denial of essentially the same

5. K.S.A. § 58–2312 contains two exceptions of costs that are not included in "the costs of collection," but neither one applies here.

facts' as its own attempts to collect an obligation and 'are not intertwined to the point of being inseparable.' " (Doc. 289 at ¶ 133 (quoting *Brennan v. Kunzle*, 37 Kan. App.2d 365, 154 P.3d 1094, 1113 (2007), *rejected on other grounds by Osterhaus v. Toth*, 291 Kan. 759, 249 P.3d 888, 903 (2011))) But the facts of *Brennan* differ significantly from those presented here. In *Brennan*, the plaintiffs sought fees under a provision in a promissory note that limited recovery to attorney's fees incurred in enforcing the note. *Brennan*, 154 P.3d at 1112. In contrast, here, the attorney's fees provisions in the Secured Promissory Note and (Superseding) Pledge Agreement contain broader language and that language provides for the recovery of attorney's fees in this litigation. Thus, the Court overrules plaintiff's eleventh and twelfth objections to the Report.

## I. Objection No. 13—Plaintiff Objects to the Report's Conclusion that Defendant Established Genuine Issues of Material Fact to Preclude Summary Judgment on Defendant's Fraud in the Inducement Claim.

In his final objection to the Report, plaintiff argues that the Report erred by concluding that defendant presented evidence establishing genuine issues of material fact sufficient to avoid summary judgment on defendant's fraud in the inducement counterclaim. Plaintiff's objection ignores that the Report provided two bases for its recommendation that the Court deny plaintiff's summary judgment motion on defendant's fraud in the inducement counterclaim.

First, the Report found that plaintiff's summary judgment motion was untimely because plaintiff filed it on July 17, 2014, more than six months after the January 10, 2014 deadline for filing such a motion. Plaintiff offered no excuse for his failure to file on time, and the Report properly rec-

ommended that the Court deny the motion as untimely filed.

■■■ Second, even if the Court excused the motion's untimeliness, the Report determined that genuine issues of material fact exist, and they prevent the Court from granting summary judgment against this counterclaim. The Report properly recited the legal standard for proving a fraud in the inducement counterclaim—defendant "must prove by clear and convincing evidence that (1) [plaintiff] made an untrue statement of existing material fact, (2) [plaintiff] knew that the statement was untrue or recklessly made it with disregard for the truth, (3) [plaintiff] made the statement with the intent to induce [defendant] to act on the statement, (4) [defendant] justifiably relied on the statement to [his] detriment and (5) [defendant] sustained injury as a result of [his] reliance." *BHC Dev., L.C. v. Bally Gaming, Inc.*, 985 F.Supp.2d 1276, 1288–89 (D.Kan.2013) (citing *Stechschulte v. Jennings*, 297 Kan. 2, 298 P.3d 1083, 1096 (2013); PIK Civ. 4th 127.40).

The Report also concluded correctly that genuine disputes of material fact exist about whether plaintiff made untrue statements in his conversations with defendant leading up to defendant's agreement to make the loan to plaintiff. The Report also correctly concluded that disputes about material facts exist over plaintiff's alleged concealment or failure to disclose certain financial matters to defendant before he agreed to make the loan to plaintiff.

Plaintiff argues that his statement of uncontroverted facts establishes his intentions to repay the loan at the time defendant agreed to make the loan to him, and, therefore, those facts foreclose defendant's fraudulent inducement claim. To support this argument, plaintiff cites some of the 30 factual statements that the Court al-

ready has addressed. *See supra* Part IV.A. As explained above, the Report properly excluded many of these factual statements from its statements of fact because they either are immaterial or not supported by the record. Viewing the undisputed, properly supported facts in the summary judgment record, the Court agrees with Judge James. Genuine issues of material fact exist, and they prevent the Court from deciding defendant's fraud in the inducement claim on summary judgment. Thus, the Report did not err by recommending that the Court deny plaintiff's motion for summary judgment on defendant's fraud in the inducement claim. The Court overrules plaintiff's thirteenth objection to the Report.

## V. Conclusion

After conducting a de novo review of the record, the Court accepts the Report and Recommendation and overrules plaintiff's objections to it. The Court also refers the parties to the Report and Recommendation for additional legal authority for the conclusions reached in this Memorandum and Order.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's objections to the Report and Recommendation of Judge James (Doc. 289) are overruled and the Report and Recommendation (Doc. 283) is adopted in its entirety.

**IT IS FURTHER ORDERED THAT** defendant's Motion for Summary Judgment on plaintiff's claim for wrongful disposition of collateral, defendant's right to a deficiency damages award, and defendant's entitlement to attorney's fees (Doc. 252) is granted.

**IT IS FURTHER ORDERED THAT** plaintiff's Motion for Summary Judgment on plaintiff's claim for wrongful disposition of collateral under K.S.A. §§ 84–9–624 and 9–626 and defendant's counterclaim for

fraud in the inducement (Doc. 255) is denied.

**IT IS FURTHER ORDERED THAT** plaintiff's Motion in Limine excluding all facts, evidence, testimony, opinions, and inferences offered by defendant's proffered expert attorney Brian C. Underwood (Doc. 261) is granted in part and denied in part, as set out in this Order.

**IT IS SO ORDERED.**

## *REPORT AND RECOMMENDATION*

### *NOTICE*

TERESA J. JAMES, United States Magistrate Judge.

Within fourteen (14) days after being served with a copy of this Report and Recommendation, any party, pursuant to 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2), may file written objections to this Report and Recommendation. A party must file any objections within the fourteen-day period if that party wants to have appellate review of the proposed findings of fact, conclusions of law, or recommended disposition. If no objections are timely filed, no appellate review will be allowed by any court.

## I. NATURE OF THE MATTER BEFORE THE COURT

By Order dated September 10, 2014 (ECF No. 282), District Judge Daniel D. Crabtree referred the following three motions to the undersigned Magistrate Judge for a report and recommendation:

- Defendant Adam Rothstein's Motion for Summary Judgment as to Plaintiff's Claim for Wrongful Disposition of Collateral, Rothstein's Right to a Deficiency Damages Award, and Entitlement to Attorney's Fees (ECF No. 252);

- Plaintiff Stanton Ross's Motion for Summary Judgment Upon his Claim

Against Defendant for Wrongful Disposition of Collateral Under K.S.A. 84–9–624 and 9–626 and Upon Defendant's Counterclaim for Fraud in the Inducement (ECF No. 255); and

- Plaintiff's First Motion for Order in Limine Excluding all Facts, Evidence, Testimony, Opinions and Inferences Offered by Defendant's Proffered Expert, Attorney Brian C. Underwood (ECF No. 261).

## II. FINDINGS OF FACT

The following facts are either uncontroverted or, where controverted, are construed for purposes of summary judgment in the light most favorable to the party opposing the summary judgment motion.[1] Immaterial facts and factual averments not properly supported by the record are omitted.

Plaintiff Stanton Ross ("Ross") is a resident of Kansas, and is currently the Chairman of the Board, President, Chief Executive Officer and a shareholder of Infinity Energy Resources, Inc. ("Infinity"), a publicly traded company having its principal place of business in Johnson County, Kansas.

Defendant Adam Rothstein ("Rothstein") is a Connecticut resident and currently the adviser to several funds concentrating in the technology, media and entertainment sectors.

Ross called Rothstein on the evening of March 29, 2012, looking for a short-term loan of $210,000, initially from Rothstein's client Stephen Gans. Ross stated it would be a very short term loan since his company, Infinity, was moments away from closing on a financing and the company owed him $300,000 in "back pay."

When the conversations turned toward the possibility of Rothstein making the loan to Ross, Rothstein told Ross that he would need the loan repaid by June 2012 for Rothstein's own estimated tax purposes. On March 30, 2012, Rothstein loaned Ross $210,000 for 60 days, pursuant to written agreements discussed below.

In the conversations leading up to Rothstein agreeing to make the loan to Ross, Ross assured Rothstein that he would be able to promptly repay the loan, stating that Infinity was near to closing on a financing from which the $300,000 in "back pay" Infinity owed him would be funded. Ross further stated that he had other assets available to him.

At no time during the conversations leading up to Rothstein agreeing to make the loan to Ross did Ross tell Rothstein there were substantial tax liens filed against Ross that would make any compensation payment to Ross from Infinity subject to being consumed by taxing authorities. However, Ross was aware of the Notice of Federal Tax Lien before he borrowed the $210,000 from Rothstein, and Ross testified at his deposition that the liens totaled around $500,000 at the time of his loan discussions with Rothstein.

At no time during the conversations leading up to Rothstein agreeing to make the loan to Ross did Ross tell Rothstein that Ross was counting on Infinity entering into a business relationship with a drilling partner that would result in Infinity being able to fund his "back pay."

At no time during the conversations leading up to Rothstein agreeing to make the loan to Ross did Ross state to Rothstein that Ross was counting on the value of Infinity's stock to rise, the sale of which would enable him to repay the loan.

At no time during the conversations leading up to Rothstein agreeing to make the loan to Ross did Ross state to Rothstein that any payment to Ross of "back

---

**1.** *Scott v. Harris,* 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

pay" by Infinity would be subject to approval by the Infinity Board or any bonus would be subject to approval by the Infinity Compensation Committee.

Before Rothstein funded the $210,000 loan to Ross on March 30, 2012, Rothstein was never told in any manner by Ross himself, or by Stephen Gans, or by any Digital Ally Board member, or by anyone else, that Ross had tax problems and tax liens filed against him.

The one Digital Ally Board meeting in which Rothstein participated was in August 2012, over 4 months after Rothstein made the loan to Ross, and Rothstein participated by conference call on a limited subject, having no individual contact with anyone.

Stephen Gans was not elected to the Board of Digital Ally, Inc. until May 25, 2012. At no time did Mr. Gans hear or otherwise learn from Stan Ross, from any other member of the Digital Ally Board, or from anyone else associated with Digital Ally, that Ross had problems with the IRS and tax liens filed against him.

The terms of the $210,000 loan from Rothstein to Ross were set forth in a "Secured Promissory Note" and "Pledge Agreement" signed by the parties. Under the terms of the Secured Promissory Note, the loan was to be repaid in full within 60 days, on or before May 31, 2012, and the interest for the Loan was to be paid by the transfer to Rothstein of 15,000 shares of Infinity stock.

By its terms, the loan became due on May 31, 2012, but Ross failed to repay the loan.

On August 27, 2012, at the request of Ross, the parties entered into a signed, written Forbearance Agreement, pursuant to which, among other things, (1) all obligations under the Secured Promissory Note were reaffirmed by Ross, (2) the default was acknowledged by Ross, and (3) the parties agreed the Loan due date would be extended to January 1, 2013, all for the additional consideration of 50,000 Consideration Shares of Infinity common stock to be delivered and transferred by Ross, in addition to the delivery and transfer by Ross of the original 15,000 Interest Shares, said transfers all to occur within seven (7) days of the execution of the Forbearance Agreement.

At the time of the Forbearance Agreement, the parties also entered into a (Superseding) Pledge Agreement, by which Ross pledged the remaining 77,310 shares of Infinity common stock that he owned.

Section 12.1 of the Forbearance Agreement provides that "Pledgee [Rothstein] may also, without notice except as specified below, sell the Pledged Collateral or any part thereof at a commercially reasonable price or prices and upon such other terms as Pledgee deems reasonable."

On January 1, 2013, the extended forbearance due date, Rothstein's business counsel e-mailed Ross notice and reiteration of his defaults under the agreements.

Ross did not repay the Loan on or before the forbearance extended due date, and his failure to repay the Loan continues to this date.

On January 30, 2013, Ross filed the underlying lawsuit against Rothstein in the District Court of Johnson County, Kansas. In his Petition, Ross asserted the following three claims against Rothstein: (1) fraudulent misrepresentation; (2) violation of the Kansas Consumer Protection Act ("KCPA"); and (3) defamation. Rothstein removed the case to this Court on February 25, 2013. In his Answer (ECF No. 4), Rothstein asserted counterclaims for breach of the Secured Promissory Note; breach of the Forbearance Agreement, breach of the Superseding Pledge Agree-

ment and foreclosure of security interest, breach of the Unconditional Guarantee, breach of the covenants of good faith and fair dealing, unjust enrichment, and fraud (including punitive damages).[2]

By Memorandum and Order dated September 11, 2013 (ECF No. 55), the court granted summary judgment in favor of Rothstein on Ross's fraud and KCPA claims. The court also granted summary judgment and entered judgment (ECF No. 56) in favor of Rothstein on his counterclaims for breach of the Secured Promissory Note; breach of the Forbearance Agreement; and breach of the (Superseding) Pledge Agreement and foreclosure of security interest in the amount of $210,000, plus 18% interest compounding monthly beginning September 5, 2012. The court further ordered that Rothstein was entitled to obtain from the Clerk of the Court the original Infinity Energy Resource, Inc. Certificate No. 3287 representing 77,310 shares of Infinity's common stock.

On September 12, 2013, the Clerk of the Court released to Rothstein the original Infinity Energy Resources, Inc. Certificate No. 3287, representing 77,310 shares of Infinity's common stock, which had previously been deposited with the Court (ECF No. 57).

On the morning of Monday, September 16, 2013, Rothstein deposited the certificate bearing the 77,310 Pledged Shares in an account with on-line broker Fidelity.com, which he had set up earlier in the year when he sold the 15,000 Infinity Interest Shares and 50,000 Infinity Consideration Shares he had previously received from Ross.

Rothstein sold the 77,310 Infinity shares in six different lots at prices ranging from $2.85 per share to $2.99 per share. The first sale occurred at 9:38 a.m. on September 16, 2013, when Rothstein sold 3,000 shares. He sold all 77,310 shares within 40 minutes. After the deduction of all brokerage fees and commissions, Rothstein realized $221,361.91 from the sale.

Rothstein opted to use online broker Fidelity.com to sell the Infinity shares in order to minimize transaction costs and preserve anonymity. His per trade commission rate at Fidelity.com was $7.95 a trade, and brokerage costs on the disposition of the 77,310 Pledged Shares totaled in the aggregate, across six trades, $47.70, or an average of $.00062 per share, or less than .03% of the realized value.

Because Infinity stock had averaged 16,-640 shares traded per day in the prior week, Rothstein avoided showing the entire 77,310 Pledged Shares at one time for fear of spooking the market and possibly driving the share price down, and instead showed small blocks of the Infinity stock. Infinity stock had closed the previous trading day at $2.92, but it opened on September 16, 2013 at $2.87 and was showing a bid for 100 shares at $2.86. Rothstein hit the bid with a small test order and it was filled on 3,000 shares at $2.86. The bid then dropped to $2.85, but a buyer of some size appeared at that price so Rothstein sold 15,000 shares of the stock at $2.85. With the stock bid at $2.85 he decided to use limit orders to hit bids that showed

---

**2.** Rothstein reasserted these same counterclaims in his Amended Answer (ECF No. 128) filed on January 6, 2014. However, in the Pretrial Order (ECF No. 247 at 19), Rothstein stated that he "does not intend to submit at trial any counterclaim against Plaintiff Ross for Rothstein's originally pleaded counterclaim of breach of the implied covenant of good faith and fair dealing or for unjust enrichment." He further stated he does not "intend to submit his claim against Plaintiff Ross under the Unconditional Guarantee, but reserves his position on using that document as evidence of the nature and extent of the attorney's fee obligation of Ross to Rothstein."

15,000 or more shares at that level or better.

At the same time that he used limit orders as described above, Rothstein tried to work smaller lots for higher prices. Over the course of the early morning he sold three lots of stock at $2.85 per share—one for 15,000 shares, one for 20,-200 shares, and one for 25,110 shares. In addition to the initial sale of 3,000 shares at $2.86, he was able to make two additional sales higher than $2.85 in the first hour of trading comprised of another sale of 7,000 shares at $2.86 and a final sale of 7,000 shares at $2.99.

The published price quotations for Infinity common stock (IFNY), on September 16, 2013, show a trading "Volume" that day of 202,600 of IFNY shares, a "Low" price that day of $2.85, a "High" price of $3.39, an "Open" price of $2.87, and a "Close" price of $3.37.

In the months before and after Rothstein sold the 77,310 Infinity shares, published price quotations for Infinity common stock ("IFNY") show that Infinity was trading at the following "highs":

| | |
|---|---|
| 8/16/2013 | $3.52 |
| 8/23/2013 | 2.75 |
| 8/30/2013 | 2.81 |
| 9/6/2013 | 2.64 |
| 9/13/2013 | 2.92 |
| 9/20/2013 | 3.40 |
| 10/4/2013 | 3.74 |
| 10/11/2013 | 3.12 |
| 10/18/2013 | 3.20 |
| 10/25/2013 | 3.00 |
| 11/1/2013 | 2.50 |
| 11/8/2013 | 2.74 |
| 11/15/2013 | 1.41 |
| 11/22/2013 | 1.57 |
| 11/29/2013 | 1.49 |
| 12/6/2013 | 1.34 |

Infinity had 20,668,575 shares of common stock issued and outstanding as of March 28, 2013. Infinity's common stock trades on the Over–the–Counter QB Tier Market "OTCQB" under the symbol "IFNY," as Infinity reports in its SEC filings. At no time in 2012, 2013 or thereafter has Infinity's common stock publicly traded or sold on any stock market other than the OTCQB.

The term "over-the-counter" ("OTC") refers to stocks that are not trading on a stock exchange, as OTC markets have never been a "place," but, in OTC markets, dealers act as market makers by quoting prices at which they will sell (ask or offer) or buy (bid) to other dealers and their clients or customers, with examples of OTC markets including the OTC Bulletin Board (OTCBB), which is a facility of the Financial Industry Regulatory Authority (FINRA), OTCQX, OTCQB, and OTC Pink.

On September 24, 2013, Rothstein served and filed his Notice of Disposition of Collateral and Intent to Pursue Deficiency in this case (ECF No. 59). The notice advised Ross that Rothstein had sold and liquidated the 77,310 Infinity shares, leaving a deficiency of $179,947.85 as of the date of sale.

On October 1, 2013, Ross filed a motion for leave to file an amended complaint to assert a claim for wrongful disposition of collateral under K.S.A. 84–9–625. At a December 17, 2013 telephone status conference, Magistrate Judge Waxse granted Ross's motion for leave to file his first amended complaint, extended the case deadlines, and set a March 28, 2014 deadline for filing any new dispositive motion on Ross's newly asserted wrongful disposition of collateral claim. Ross filed his First Amended Complaint for Injunction and Damages (ECF No. 117) on December 23, 2013.

On April 9, 2014, the Court granted summary judgment in favor of Rothstein on Ross's defamation claim (ECF No. 201).

Rothstein thereafter filed a motion (ECF No. 120) seeking to clarify that only the deadline for filing any dispositive mo-

tion relating to his claim for a deficiency damages award or judgment was extended to March 28, 2014. The Court entered an Order granting that clarification (ECF No. 130). On March 11, 2014, upon the agreed motion of Rothstein, the Court entered a Second Amended Scheduling Order (ECF No. 188) extending the "deadline for filing dispositive motions" to May 28, 2014. The Third Amended Scheduling Order (ECF No. 211) extended the "deadline for filing dispositive motions" to June 11, 2014. The Fourth Amended Scheduling Order (ECF No. 243) further extended the "dispositive motion deadline" to the "earlier of two weeks after Ross and Rothstein are deposed, or July 7, 2014." In the Pretrial Order (ECF No. 247), the dispositive motion deadline was extended to July 11, 2014. Rothstein indicated in the Pretrial Order that he reserved any objection he may have under the Court's prior scheduling orders as to the timeliness of any Ross dispositive motion that is unrelated to Ross's wrongful disposition claim or Rothstein's deficiency claim. Upon two more joint motions of the parties, the Court extended the dispositive motion deadline to July 15 and ultimately to July 17, 2014 (ECF Nos. 249 and 251).

Rothstein and Ross filed their respective motions for summary judgment on July 17, 2014. Ross filed his motion seeking to exclude the affidavit of Rothstein's expert on July 18, 2014.

## III. MOTION SEEKING TO EXCLUDE OPINIONS OF ROTHSTEIN'S EXPERT BRIAN C. UNDERWOOD

Ross has filed a motion in limine seeking to exclude "all facts, evidence, testimony, opinions and inferences" offered by Rothstein's proffered expert witness, attorney Brian C. Underwood ("Underwood"). Pertinent here is the Affidavit Constituting Expert Report of Underwood on Behalf of Defendant/Counterclaimant Rothstein (ECF No. 261–1) ("Affidavit"), which Rothstein has offered in support of his motion for summary judgment and in opposition to Ross's motion for summary judgment. In his limine motion, Ross requests that Underwood's Affidavit or any testimony be excluded for any purpose, whether at trial or hearing, or in the context of any motion submitted at or before trial. He argues that the Affidavit testimony proffered by Underwood consists of nothing more than legal opinions, and that Underwood is not qualified to make such legal pronouncements. In particular, Ross takes issue with the following four opinions in Underwood's Affidavit:

Opinion No. 1: The OTCQB is a "recognized market" as that term is used in Kansas Uniform Commercial Code (UCC) statutes, K.S.A. 84–9–610; 84–9611(1); and 84–9–627(b).

Opinion No. 2: The pledged shares of [Infinity] stock, sold by Adam Rothstein on September 16, 2013 on the OTCQB, were "of a type customarily sold on a recognized market," as that term is used in Kansas UCC statute, K.S.A. § 84–9611(d).

Opinion No. 3: The pledged shares of [Infinity] stock, sold by Adam Rothstein on September 16, 2013 on the OTCQB, were sold "in the usual manner" on a "recognized market"; "at the price current" in a "recognized market"; and "in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition," as those terms are used in Kansas U.C.C. statutes, K.S.A. 84–9–627(b)(1), (2) and (3).

Opinion No. 4: Every aspect of Adam Rothstein's sale of the Pledged Shares of [Infinity] stock on September 16, 2013, was "commercially reasonable," as that term is used in Kansas UCC stat-

utes, including K.S.A. 84–9–607(c); 84–9–610(a) and (b); and 84–9–627(a).[3]

Rothstein argues that the Underwood Affidavit should be allowed to assist the trier of fact in understanding certain ultimate fact questions such as how the OTCQB actually functions and whether this market—where Rothstein liquidated the Infinity shares—matches the criteria associated with a "recognized market." He also asserts that the Affidavit will assist the trier of fact in determining whether the collateral disposition was commercially reasonable, by assisting in the understanding of whether the shares were "of a type customarily sold on a recognized market," whether they were sold "in the usual manner" on a "recognized market," whether the shares were sold "at the price current" in the "recognized market," whether they were sold "in conformity with reasonable commercial practices among [stock] dealers," and whether the facts and circumstances of Rothstein's sale and handling of the liquidation process was commercially reasonable.

Federal Rule of Civil Procedure 56(c)(1)(4) requires that an affidavit used to support or oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." The Tenth Circuit has recognized that an affidavit which fails to meet the requirements of Rule 56 is subject to a motion to strike, but formal defects are waived in the absence of a motion or other objection.[4]

An affidavit submitted by an expert, however, must also comply with Federal Rules of Evidence 702 to 704. In determining whether expert testimony is admissible, the court generally must first determine whether the expert is qualified "by knowledge, skill, experience, training, or education" to render an opinion.[5] If sufficiently qualified, the court must then determine whether the other elements of Federal Rule of Evidence 702 are met. A qualified expert may testify in the form of an opinion if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.[6]

Fed.R.Evid. 703 further provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." An expert's opinion "is not objectionable just because it embraces an ultimate issue."[7] The proponent of expert opinion testimony has the burden of establishing the admissibility of those opinions under Rule 702.[8]

"[R]ejection of expert testimony is the exception rather than the rule."[9]

---

3. Underwood Aff. (ECF No. 261–1) at 6, 9, 10, and 13.

4. *Noblett v. Gen. Elec. Credit Corp.,* 400 F.2d 442, 445 (10th Cir.1968).

5. Fed.R.Evid. 702.

6. Fed.R.Evid. 702.

7. Fed.R.Evid. 704(a).

8. *United States v. Nacchio,* 555 F.3d 1234, 1241 (10th Cir.2009).

9. Fed.R.Evid. 702 advisory committee notes; *State Farm Fire & Cas. Co. v. Bell,* 30 F.Supp.3d 1085, 1094 (D.Kan.2014).

While Daubert requires the Court to act as a gatekeeper for the admission of expert testimony, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" remain "the traditional and appropriate means of attacking shaky but admissible evidence." [10]

 The Court has discretion "to determine *how* to perform its gatekeeping function under *Daubert*." [11] Although the most common method for fulfilling this function is a *Daubert* hearing, such a process is not specifically mandated.[12] The district court may also satisfy its gatekeeper role when asked to rule on a motion in limine, on an objection during trial, or on a post-trial motion so long as the court has sufficient evidence to perform "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." [13] In this case, the parties do not request a hearing. The Court has carefully reviewed the motion in limine, all of the legal memoranda on the motion filed by both parties, and the Underwood Affidavit and finds this review to be sufficient to render a decision without conducting a hearing.[14]

### A. Underwood's Qualifications

Ross first challenges the Underwood Affidavit on the basis that Underwood is not qualified to be an expert or to testify to or provide the opinions he sets forth in his Affidavit. Ross points out that Underwood does not once mention commercial law, the UCC, UCC Article 9, or Part 6 of Article 9 in his Affidavit. Ross further claims that Underwood lists no experience as a lawyer, lecturer, mediator, or professional witness involving commercial law, the UCC, UCC Article 9, Part 6 of UCC Article 9, or Article 9, Part 6 as it relates to the disposition of collateral after default.

Rothstein counters that Underwood has numerous qualifications, including having 25 years of experience in the broker-dealer and investment advisory industry, including as Chief Compliance Officer of A.G. Edwards and Wachovia Securities. He points out that Ross opted to not depose Underwood, and to not designate any expert himself, either affirmatively or in rebuttal.

 Rule 702 does not impose an "overly rigorous" requirement of expertise, recognizing that specialized knowledge may be acquired through a broad range of experience, skills or training.[15] The trial court should not exclude expert testimony simply because the court feels that the proffered witness is not the most qualified or does not have the specialization considered most appropriate by the court.[16] As long as an expert stays "within the reasonable confines of his subject area," the lack of specialization affects the weight of his opinion and not its admissibility.[17] The

---

**10.** *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (citation omitted).

**11.** *Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir.2000) (emphasis in original).

**12.** *Id.* (citations omitted).

**13.** *Id.* (quoting *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786).

**14.** *See State Farm*, 30 F.Supp.3d at 1094–95 (hearing not necessary to render decision on

motions to exclude expert testimony filed in connection with motion for summary judgment).

**15.** *Squires ex rel. Squires v. Goodwin*, 829 F.Supp.2d 1041, 1048 (D.Colo.2011) (citing *United States v. Velasquez*, 64 F.3d 844, 849 (3d Cir.1995)).

**16.** *Id.*

**17.** *See P.S. ex rel. Nelson v. The Farm, Inc.*, 658 F.Supp.2d 1281, 1291 (D.Kan.2009) (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir.2001)).

qualification element of Rule 702, however, is not insignificant and must be satisfied as an essential prerequisite for the admissibility of the expert's opinions. The witness is required to possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would aid the trier of fact in his search for truth." [18]

■ The Court has carefully reviewed Underwood's Affidavit, along with the attachments which detail his education, professional background, publications and speaking engagements, licenses and professional memberships, and list of cases in which he has testified as an expert at trial or deposition. The Court concludes that Underwood has quite significant knowledge, skill, experience, training or education in the areas of the securities industry, the securities markets in general, over-the-counter securities, the OTC securities markets, FINRA, the OTCQB, OTC link ATS (OTC Link), and the customs and practices in the financial services industry. Any lack of experience he might have had in cases involving the specific sections of the Kansas UCC at issue in the wrongful disposition of collateral claim in this case does not render him unqualified with regard to the securities industry, the securities markets, over-the-counter securities, the OTC securities markets, FINRA, the OTCQB, OTC link ATS (OTC Link), and the customs and practices in the financial services industry. Underwood's expertise is pertinent to the issues in the case. The Court finds Underwood clearly qualified as an expert in these areas under Fed. R.Evid. 702.

## B. Legal Opinions

Ross next argues that Underwood's opinions are legal opinions which he is not competent to render and which fail to edify the trier of fact and will only serve to confuse it. He cites the Ninth Circuit case, *Nationwide Transport Finance v. Cass Information Systems, Inc.,*[19] as an example of a case where an expert's legal explanations and conclusions that "discuss the UCC and/or apply the UCC to the facts" or "discuss non-UCC law and/or apply non-UCC law to the facts" were excluded as legal conclusions.

Rothstein maintains that Underwood's Affidavit and opinions are admissible because they satisfy Fed.R.Evid. 702, 703, and 704, and Underwood, while permissibly referring to the law that frames the fact issues, states opinions that will help the trier of fact to understand the evidence or to determine the fact issues. He argues that under Fed.R.Evid. 704(a), Underwood's expert opinion "is not objectionable just because it embraces an ultimate issue." He contends that an expert can refer to the law in expressing his opinions.

An expert witness may testify regarding an ultimate issue of fact but may not offer an opinion that "articulates the ultimate principles of law governing the deliberations of the jury." [20] An expert witness may also refer to the law in expressing an opinion so long as the expert does not "state legal conclusions drawn by applying the law to the facts." [21] Witnesses may

---

**18.** *Markham v. BTM Corp.*, No. 08–4032–SAC, 2011 WL 1231084, at *16 (D.Kan. Mar. 30, 2011) (quoting *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir.2004)).

**19.** 523 F.3d 1051, 1058–59 (9th Cir.2008).

**20.** *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir.1988) (en banc).

**21.** *A.E. By & Through Evans v. Indep. Sch. Dist. No. 25*, 936 F.2d 472, 476 (10th Cir. 1991). *See also Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir.1998) ("Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts.").

not "give an opinion on a question of law," because the court alone is the "arbiter of the law and its applicability."[22] To hold otherwise would permit multiple statements of the law to "intolerably confound the jury."[23] Thus, while Fed.R.Evid. 704 provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue," the embraced issues are limited to *factual* rather than legal issues.[24] "The basis for this distinction is that testimony on the ultimate factual questions aids the jury in reaching a verdict; testimony which articulates and applies the relevant law, however, circumvents the jury's decision-making function by telling it how to decide the case."[25]

▪ Applying this law to the four opinions expressed by Underwood in his Affidavit, the Court finds that these opinions embrace issues that are not limited to factual issues, but rather embrace ultimate legal issues.[26] The Court agrees with Ross that under *Specht*[27] it would be improper for the Court to allow Underwood's opinion that the OTCQB is a "recognized market," as that term is used in Kansas Uniform Commercial Code ("UCC"). This is an opinion on a question of law and articulates a legal conclusion drawn by applying the law to the facts.[28] The Court finds the *Nationwide* case cited by Ross to be on point and persuasive on this issue. In *Nationwide Transport Finance*,[29] the Ninth Circuit affirmed the district court's

exclusion of an expert's legal explanations and conclusions in "sections that discuss the UCC and/or apply the UCC to the facts of this case."[30] The court found that the expert's legal conclusions "not only invaded the province of the trial judge, but constituted erroneous statements of law."[31] This is very similar to the legal conclusions being offered by Underwood in this case. Underwood is not just identifying issues of law or referring to the applicable law in expressing his opinions, rather he is providing his opinions in the form of legal conclusions he reaches by applying those issues of law to the facts presented in this case.

While Underwood may not provide an opinion that defines the legal parameters for the fact-finder, he may, however, testify about factual issues that will assist the Court in making a legal determination. In this case, the Court may consider Underwood's statements in his Affidavit regarding relevant factual issues such as the operation, function, and trading of stocks on over-the-counter securities markets generally, as well as the OTCQB in particular and how it functions, operates, and how stocks trade on the OTCQB. The Court also will consider statement made in Underwood's Affidavit regarding the details of Rothstein's actual trades of the Infinity shares at issue. Such testimony may assist the Court in reaching its own legal conclusion whether the OTCQB is a

**22.** *Specht,* 853 F.2d at 808.

**23.** *Id.*

**24.** *Id.* (emphasis added).

**25.** *Id.*

**26.** In this Court's experience, the 15–page Underwood Affidavit is highly unusual and extends far beyond what would ordinarily be accepted and considered on summary judgment. The Underwood report reads like a treatise and the entire report has been presented in the form of an affidavit, apparently

with the expectation that the entire report would be filed in support of summary judgment.

**27.** *Specht,* 853 F.2d at 808.

**28.** *A.E. By & Through Evans,* 936 F.2d at 476.

**29.** 523 F.3d 1051, 1058–59 (9th Cir.2008).

**30.** *Id.* at 1058.

**31.** *Id.* at 1059.

"recognized market" under the Kansas UCC.

With regard to Underwood's opinion that the pledged shares of Infinity stock, sold by Rothstein on September 16, 2013 on the OTCQB, were "of a type customarily sold on a recognized market," under K.S.A. 84–9–611(d), the Court likewise finds this to constitute an impermissible legal conclusion. Similarly, the Court finds that Underwood's opinions that the pledged shares of Infinity stock were sold "in the usual manner" on a "recognized market"; "at the price current" in a "recognized market"; and "in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition," as those terms are used in K.S.A. 84–9–627(b)(1)–(3), are all impermissible legal conclusions. Again, however, as noted previously, the Court may consider Underwood's factual statements regarding relevant issues such as the operation, function, and trading of stocks on the OTCQB, as well as the details of Rothstein's actual trades of the Infinity shares at issue.

Finally, the Court again agrees with Ross that Underwood is asserting an improper legal opinion when he opines that every aspect of Rothstein's sale of the Infinity shares on September 16, 2013, was "commercially reasonable," as that term is used in K.S.A. 84–9–607(c); 84–9–610(a)–(b); and 84–9–627(a).

Accordingly, for the foregoing reasons, the undersigned Magistrate Judge recommends that Ross's First Motion for Order in Limine Excluding all Facts, Evidence, Testimony, Opinions and Inferences Offered by Defendant's Proffered Expert At-torney Brian C. Underwood be granted in part and denied in part, and that Underwood's four opinions set forth in his Affidavit be excluded from trial and from being considered by the Court in conjunction with the rulings on the motions for summary judgment. The Court will disregard Underwood's legal opinions in the recommended rulings herein on the pending cross motions for summary judgment.[32] The Court will, however, consider the factual information provided by Underwood in his Affidavit, particularly as to trading on the OTC markets and the OTCQB in particular, in making its own legal conclusions.

## IV. CROSS MOTIONS FOR SUMMARY JUDGMENT

The parties have filed cross motions for summary judgment. In Defendant Rothstein's motion, he requests that the Court enter summary judgment on Ross's claim for wrongful disposition of collateral. Rothstein also requests that the Court determine and order that he is entitled to a deficiency determination and award as to his damages, as well as his reasonable attorney's fees and expenses. Finally, Rothstein requests that the Court order that Ross is not entitled to recover from Rothstein any attorney's fees Ross has incurred in this matter.

In his motion, Plaintiff Ross moves the Court for summary judgment upon his claim against Rothstein for wrongful disposition of collateral under K.S.A. 84–9–625 and 9–626 and upon Rothstein's counterclaim against Ross for fraud in the inducement.

---

**32.** *See U.S. ex rel. Maxwell v. Kerr–McGee Chem. Worldwide, LLC,* No. 04CV01224PSFCBS, 2006 WL 2053534, at *4 (D.Colo. July 21, 2006) (district court is free to disregard any inadmissible portions of expert report in deciding motion for summary judgment); *City of Chanute, Kan. v. Williams Natural Gas Co.,* 743 F.Supp. 1437, 1445 n. 4 (D.Kan.1990) ("A court is free to disregard the inadmissible parts and consider the rest of the [expert's] affidavit.").

### A. Summary Judgment Standard

Under Fed.R.Civ.P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(c)(1) further provides that the party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

"The court need consider only the cited materials, but it may consider other material in the record." [33] When ruling on a motion for summary judgment, a court must view the evidence and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.[34]

A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue.[35] Although the court views the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party, summary judgment is warranted if the moving party "points out a lack of evidence to support an essential element of the claim and the nonmovant cannot identify specific facts that would create a genuine issue." [36]

When the parties file cross motions for summary judgment, the court must analyze each motion individually and on its own merits.[37] But where the cross motions overlap, the court may address the legal arguments together.[38] The court is also "entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." [39]

### B. Wrongful Disposition of Collateral Claim

Ross and Rothstein each seek summary judgment on Ross's claim for wrongful disposition of the 77,310 shares of Infinity common stock, which Ross had pledged to Rothstein as collateral. Rothstein seeks a determination by the Court that his sale disposing of the pledged shares was commercially reasonable and in compliance with Kansas UCC Article 9 Part 6. Specifically, Rothstein contends (1) the sale was in accordance with the parties' valid and enforceable post-default written agreement

---

**33.** Fed.R.Civ.P. 56(c)(3).

**34.** *Kerber v. Qwest Grp. Life Ins. Plan,* 647 F.3d 950, 959 (10th Cir.2011).

**35.** *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

**36.** *Water Pik, Inc. v. Med–Systems, Inc.,* 726 F.3d 1136, 1143–44 (10th Cir.2013).

**37.** *Buell Cabinet Co. v. Sudduth,* 608 F.2d 431, 433 (10th Cir.1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

**38.** *Berges v. Standard Ins. Co.,* 704 F.Supp.2d 1149, 1155 (D.Kan.2010).

**39.** *Atlantic Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir. 2000) (quoting *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.,* 132 F.3d 1316, 1319 (10th Cir.1997)).

regarding disposition of the Pledged Shares, in which agreement Ross effectively waived notice, and (2) the sale was commercially reasonable as being conducted on a "recognized market," and/or as being conducted in conformity with reasonable commercial practices.

Conversely, Ross argues that summary judgment is warranted on his wrongful disposition of collateral claim because he has shown that Rothstein failed to give him the required prior notice of the sale of 77,310 shares of the Infinity stock, failed to obtain a written and authenticated waiver of such notice after default in payment of the obligation secured by that collateral, and failed to sell the collateral on a "recognized market." Ross contends that under K.S.A. 84–9–626, Rothstein has the burden to show either that he complied with each of the provisions of K.S.A. 84–9–601 through 9–628 relating to the enforcement of security interests and/or the disposition of collateral, or that a fully-compliant disposition of the collateral at issue would have produced less in proceeds than were actually received through non-compliance. He contends that, as a result of Rothstein's inability to satisfy the requirements of K.S.A. 84–9626(4) by proving that the amount of proceeds that would have been realized from the sale of such collateral would have been less had he actually complied with the notice and all other requirements of K.S.A. Chapter 84, Rothstein's claim for the recovery of any deficiency has been extinguished as a matter of law.

### 1. Waiver of Notice of Collateral Disposition

Ross contends that because Rothstein did not give him any notice before the September 16, 2013 sale disposing of the 77,310 pledged Infinity shares constituting the collateral, Rothstein has the burden of proving that he was somehow excused

from doing so. To satisfy that burden, Ross claims Rothstein must show either that notice was unnecessary because the sale qualified for one of the exceptions to notice that appear in K.S.A. 84–9–611(d), or that Ross in fact waived his right to notification of disposition of the collateral.

K.S.A. 84–9–626(3) limits the amount of a deficiency if a secured party fails to prove he acted in compliance with the provisions relating to collection, enforcement, disposition or acceptance. It provides:

[I]f a secured party fails to prove that the collection, enforcement, disposition, or acceptance was conducted in accordance with the provisions of this part relating to collection, enforcement, disposition, or acceptance, the liability of a debtor or a secondary obligor for a deficiency is limited to an amount by which the sum of the secured obligation, expenses, and attorney fees exceeds the greater of:

(A) The proceeds of the collection, enforcement, disposition, or acceptance; or

(B) the amount of proceeds that would have been realized had the noncomplying secured party proceeded in accordance with the provisions of this part relating to collection, enforcement, disposition, or acceptance.

K.S.A. 84–9–626(4) further provides "[t]he amount of proceeds that would have been realized is equal to the sum of the secured obligation, expenses, and attorney fees unless the secured party proves that the amount is less than that sum."

One of the provisions related to disposition of collateral is K.S.A. 84–9–611, which requires a secured party who disposes of collateral to send a "reasonable authenticated notification of disposition" to the debtor. However, the notice requirement does not apply "if the collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market." [40] K.S.A. 84–9–612

---

**40.** K.S.A. 84–9–611(d).

further provides that whether a notification is sent within a reasonable time is a question of fact, but a notification of disposition sent after default and 10 days or more before the earliest time of disposition set forth in the notification is a reasonable time before the disposition.

In this case, the parties agree that Ross received no prior notice of Rothstein's September 16, 2013 disposition of the Infinity shares. Rothstein argues that no notice was required because Ross waived any right to notice of the disposition of the collateral in the August 27, 2012 Pledge Agreement. Section 12.1 of the Pledge Agreement allowed Rothstein "without notice except as specified below, [to] sell the Pledged Collateral or any part thereof at a commercially reasonable price or prices and upon such other terms as Pledgee [Rothstein] deems reasonable."

**a) Whether Waiver Was Post Default**

Ross argues that any waiver of notice that may appear in the Pledge Agreement cannot be deemed to be a waiver entered into and authenticated by Ross "after default" within the meaning of K.S.A. 84–9–624(a). According to Ross, any waiver appearing in a document which Ross executed on August 27, 2012 cannot be deemed to be a "post-default waiver" when in fact the default did not occur until January 1, 2013.

Rothstein counters that Ross ignores the controlling provisions in the Forbearance Agreement by which he not only acknowledged, but reiterated the May 31, 2012 default date, and specifically agreed there was no waiver by Rothstein of his rights with respect to that existing default date. Rothstein points out that there is no language in the Forbearance Agreement stating that the "term" of the loan was extended to January 1, 2013, but rather the Forbearance Agreement only states that Rothstein would forbear from exercising his rights until January 1, 2013.

K.S.A. 84–9–624(a) governs the waiver by a debtor of his right to notice of the disposition of collateral. It provides that "[a] debtor or secondary obligor may waive the right to notification of disposition of collateral under K.S.A.2009 Supp. 84–9–611 and amendments thereto only by an agreement to that effect entered into and authenticated after default."

Here, the Court finds that Ross defaulted on the Promissory Note on May 31, 2012. His subsequent execution of the (Superseding) Pledge Agreement on August 27, 2013, which contained the waiver of notice provision in Section 12.1, constitutes a post-default waiver of his right to notification of disposition of the collateral under K.S.A. 84–9–624(a). The Forbearance Agreement, executed the same day as the Pledge Agreement, recited that May 31, 2012 was the date that Ross failed to pay Rothstein the outstanding principal balance resulting in an "Event of Default." It did not, as Ross argues, extend the maturity date to January 1, 2013, but only provided that Rothstein would forbear taking any remedial action on the note in connection with the non-payment default until January 1, 2013. Ross's waiver of his right to notice of disposition of the collateral, contained in Section 12.1 of the (Superseding) Pledge Agreement, was therefore a post-default waiver.

**b) Whether Waiver Excepted Notices of Sale**

Ross next argues that the (Superseding) Pledge Agreement language allowing Rothstein to sell the collateral without notice has an exception for notices of sale. Paragraph 12.1 provides that upon default, Rothstein may "without notice except as specified below, sell the Pledged Collateral or any part thereof at a commercially reasonable price or prices and upon such other terms as Pledgee deems reasonable." Ross contends that the phrase "except as

specified below" is referring to succeeding paragraph 17, which expressly requires all notices, including "any notice of default or notice of sale" under the Pledge Agreement, be in writing and served in a particular manner. Ross contends paragraph 17 thus provides an exception for notices of sale and Rothstein must provide him with written notice of the sale of the Infinity shares.

Rothstein disagrees with Ross's interpretation of the "specified below" language in paragraph 12.1. He argues that there is no provision immediately following that paragraph which would constitute an exception "specified below." He also argues that paragraph 17 concerns merely the mechanics of notice and only comes into play for notices actually required under the Pledge Agreement, if any, and does not resurrect a requirement that Rothstein give notice when it sells the pledged collateral.

Based upon its review of the (Superseding) Pledge Agreement, the Court does not find paragraph 17 to create a notice of sale requirement, and thus an exception to paragraph 12.1's provision that permits Rothstein "without notice except as specified below" to sell the Pledged Collateral. The Court reads paragraph 17 to only specify the manner in which notice is to be provided, if such notice is required by the Pledge Agreement. It does not create a notice requirement, but only provides that if such notice is required, it must be in writing and delivered in a particular manner. The Court further finds that paragraph 12.1's "except as specified below" language does not refer to all the succeeding paragraphs 13 through 25, including paragraph 17's requirement that notices be in writing and served in a particular manner. The Court reads "except as specified below" to refer to any exceptions that would be listed, if any, immediately following that paragraph and before the next

paragraph. While it would have been clearer had the parties had indicated "None" in the space following paragraph 12.1 of the Pledge Agreement, this does not change the Court's opinion that the parties did not intend for paragraph 17 to be an exception "specified below" in paragraph 12.1. Instead, the Court finds that paragraph 17 simply provides the mechanics, i.e., notices must be in writing, with regard to notices otherwise required under the Pledge Agreement. Accordingly, the Court finds that, pursuant to paragraph 12.1 of the (Superseding) Pledge Agreement, Ross waived his right to receive prior notification of Rothstein's sale of the 77,310 shares of Infinity stock on September 16, 2013.

### 2. Whether Defendant Rothstein's Disposition of Collateral Was Commercially Reasonable

■ In order to avoid K.S.A. 84–9–626's limit on the amount of deficiency, Rothstein also must show that his disposition of the 77,310 shares of Infinity stock pledged as collateral was commercially reasonable under K.S.A. 84–9–610 and 9–627. The parties agree that Infinity's common stock trades on the Over–the–Counter QB Tier Market "OTCQB," and that at no time in 2012, 2013 or thereafter has Infinity's common stock publicly traded or sold on any stock market other than the OTCQB. The parties further agree that Rothstein sold the 77,310 share of Infinity common stock in six different lots on September 16, 2013, by trading them on the OTCQB through the registered online broker Fidelity.com. What the parties dispute is whether Rothstein's disposition of the Infinity shares by trading them on the OTCQB was commercially reasonable. Rothstein maintains that the disposition was commercially reasonable because the OTCQB is a "recognized market" under K.S.A. 84–9–627(b). Ross, however, ar-

gues that the OTCQB is not a "recognized market" because the share prices on the OTCQB are subject to individual negotiation.

K.S.A. 84–9–610 governs the disposition of collateral after default. It provides, in pertinent part, that:

> (a) **Disposition after default.** After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing.
>
> (b) **Commercially reasonable disposition.** Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.

Whether a disposition of collateral is commercially reasonable is governed by K.S.A. 849–627, which provides that:

> (a) **Greater amount obtainable under other circumstances; no preclusion of commercial reasonableness.** The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner.
>
> (b) **Dispositions that are commercially reasonable.** A disposition of collateral is made in a commercially reasonable manner if the disposition is made:
>
> (1) In the usual manner on any recognized market;
>
> (2) at the price current in any recognized market at the time of the disposition; or
>
> (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

Rothstein admits that no OTC market is an "exchange," but argues that his disposition of the collateral was made in a commercially reasonable manner because it was "[i]n the usual manner on any recognized market" under K.S.A. 84–9–627(b)(1). Although no section of the Kansas UCC defines "recognized market," Comment 9 to K.S.A. 84–9–610 provides the following explanation of the term:

> A "recognized market," as used in [§ 9–610(c)] and Section 9–611(d) is one in which the items sold are fungible and prices are not subject to individual negotiation. For example, the New York Stock Exchange is a recognized market. A market in which prices are individually negotiated or the items are not fungible is not a recognized market, even if the items are the subject of widely disseminated price guides or are disposed of through dealer auctions.

"Fungible goods" are defined by K.S.A. 84–1–201(18) as "goods of which any unit, by nature or usage of trade, is the equivalent of any other like unit." Courts consider shares of stock of the same class to be fungible as each certificate denotes identical rights.[41] Each share of Infinity

---

41. *See Gail v. United States,* 58 F.3d 580, 585 n. 7 (10th Cir.1995) ("In the case of securities, for example, it is a simple thing to replace shares of stock because they are fungible-one share of General Motors stock is as good as any other."); *Ohio Drill & Tool Co. v. Johnson,* 498 F.2d 186, 194 (6th Cir.1974) ("Equity securities are treated as fungible items. 'Since all shares of a corporation's stock are alike and interchangeable, it is of no consequence whether those bought and sold are represented by the same certificates.' ").

stock sold by Rothstein was common stock interchangeable with every other share sold. Accordingly, the Court finds that the Infinity shares sold by Rothstein were fungible goods.

The next question in determining whether the OTCQB is a "recognized market" is whether the prices are individually negotiated or subject to individual negotiation. This is a more difficult question as it requires greater understanding of the OTCQB market on which Rothstein sold the Infinity shares. The parties do not cite, nor has the Court found, any case in which any court has addressed whether collateral securities sold on the OTCQB were sold on a "recognized market" under the UCC. Comment 9 identifies stock exchanges such as the New York Stock Exchange ("NYSE") as a "recognized market" for the purpose of establishing that a disposition of collateral is made in a commercially reasonable manner.[42] Other courts have found major stock exchanges to be "recognized markets." [43] The law, however, is less clear whether other securities markets such as the OTCQB would likewise be considered a "recognized market." Scholarly commentators have further defined a "recognized market" for purposes of collateral dispositions under the UCC as "one in which the items sold are fungible and prices are not individually negotiated. Moreover, even if the items sold on a market are subject to widely disseminated price guides or are sold through dealer auctions, that market is not a 'recognized market' if its prices are indi-

vidually negotiated or the items sold on it are not fungible." [44] Another law review article has described a "recognized market" as "one where there is no haggling over price, no competitive bidding, and where marketing efforts will not affect the price received at the sale." [45]

Ross argues that the OTCQB is not a "recognized market" under K.S.A. 84-9-627(b)(1)(2) because Rothstein sold the 77,310 infinity shares in less than 40 minutes on September 16, 2013 using an OTC "quotation service." He argues that Rothstein's use of limit orders to hit bids that allowed 15,000 or more shares at the bid price of "$2.85" and his attempt to work smaller lots for higher prices shows that he used human connivance and powers of manipulation to sell the 77,310 Pledged Shares for what he says was the "best" price obtainable. Ross also makes several statements about the OTCQB, such as there is no central "exchange" for securities that trade in the OTCQB and a broker-dealer must communicate and trade directly with other broker-dealers. He also states that "in order to notify other broker-dealers that they are willing to trade a security at a particular price, broker-dealers post their 'quotes' on an inter-dealer Quotations system such as OTC Link® ATS." In support of these statements, Ross offers three exhibits consisting of screen prints from the OTC Market's website entitled "Market 101—Introduction" (ECF No. 272-4), "Market 101—Market Structure" (ECF No. 272-3),

**42.** K.S.A. 84-9-610, cmt. 9.

**43.** *See Layne v. Bank One, Ky., N.A.*, 395 F.3d 271, 280-81 (6th Cir.2005) (sale of the stock on the NASDAQ, a recognized market, was commercially reasonable); *Suffield Bank v. LaRoche*, 752 F.Supp. 54, 59 (D.R.I.1990) (collateral stock sold on American Stock Exchange was commercially reasonable as it was sold on a "recognized market").

**44.** Alan M. Christenfeld and Barbara M. Goodstein, *Enforcing Security Interests Under Article 9 of the UCC*, 242 N.Y.L.J. 5 (Aug. 6, 2009).

**45.** Maury B. Poscover, *A Commercially Reasonable Sale Under Article 9: Commercial, Reasonable, and Fair to All Involved*, 28 Loy. L.A. L.Rev. 235, 238 n. 9 (1994) (citing *Kitmitto v. First Pa. Bank, N.A.*, 518 F.Supp. 297, 302-03 (E.D.Pa.1981)).

and "Market 101—Trading" (ECF No. 272–5).[46]

The Court has reviewed these screen prints from the OTC Market's website and questions the authenticity and admissibility of the statements contained therein.[47] Even setting aside the admissibility of these screen prints, the Court finds the information in them does not support Ross's position that the OTCQB is distinguishable from other "recognized" securities markets because prices of OTCQB securities are individually negotiated, and therefore the OTCQB should not be a considered a "recognized market" under K.S.A. 84–9–627(b)(1) or (2). The Court notes that the "Market 101—Market Structure" screen print from the OTC Market's website actually states that investors in OTCQB marketplaces can buy and sell securities "in a manner almost identical to that of trading NYSE or NASDAQ securities, through the broker of their choice (institutional, online, retail)."[48]

The OTC Markets "Market 101—Trading" screen shot again states that "trading an OTCQX, OTCQB or OTC Pink security is comparable to trading a security on NYSE or NASDAQ. Investors may buy and sell securities through the institutional, online or retail broker-dealer of their choice." It further provides a detailed explanation of the trading process for an individual investor.

Rothstein argues that the OTCQB is a "recognized market" under K.S.A. 84–9–627(b)(1)(2), and disputes the descriptions provided by Ross. According to Rothstein's expert witness Underwood, when Rothstein sold the Infinity shares, his registered broker-dealer electronically transmitted limit orders to sell the collateral to OTC Link for execution on OTCQB. Underwood describes the OTCQB as an "electronic inter-dealer quotation system that displays real-time quotes, last-sale prices, and volume information for many OTC equity securities that are not listed on a national securities exchange."[49] "Only broker-dealers qualified with FINRA as market makers can apply to quote securities on the OTCQB."[50] "Under the OTCQB's eligibility rule, companies that want to have their securities quoted on the OTCQB must seek the sponsorship of a market maker as well as file current financial reports with the SEC or with their banking or insurance regulator."[51] Underwood further states in his Affidavit that the "OTCQB market is clearly a market where 'marketable securities' are sold," and is a market where there are "standardized price quotations."[52]

Underwood states in his Affidavit that there is no difference in the manner in which stocks are traded on the NYSE, other exchanges, or on ATS that is material to the issue of whether a particular market is a recognized market for purposes of Article 9 of the UCC.[53] In all instances, the process involves offers to sell at a specific price and a specific size ("Ask") and offers to buy at a specific price and a specific size ("Bid"). The best bid

---

**46.** Rothstein also objects to the OTC Market screen prints as unauthenticated and otherwise inadmissible hearsay.

**47.** Ross Ex. 5 (ECF No. 272–5). "For purposes of summary judgment, the court does not consider unsworn, unauthenticated documents, including printed copies of web sites." *ColtTech, LLC v. JLL Partners, Inc.,* 538 F.Supp.2d 1355, 1357 n. 3 (D.Kan.2008).

**48.** *Id.*

**49.** Underwood Aff. (ECF No. 253–3) ¶ 28.

**50.** Underwood Aff. ¶ 29.

**51.** Underwood Aff. ¶ 29.

**52.** Underwood Aff. ¶¶ 39–40.

**53.** Underwood Aff. ¶ 46.

and the best offer establish the prevailing market, which is publicly disseminated. If there is a Bid and an Ask at the same price, a sale occurs; if there is a spread between the Bid and Ask, then either one or both of the parties can change their Bid or Ask to eliminate the spread, and a sale occurs; or no sale occurs. In all instances the entire process is subject to all applicable federal securities laws, the rules and regulations of the SEC, all applicable FINRA rules and regulations, as well as to on-going SEC and FINRA oversight.[54]

Underwood also states in his Affidavit that the sale of the Infinity shares traded on the OTCQB "were sold in a recognized market at standardized prices; and the sale of the shares [was] not the subject of individual negotiation."[55] His conclusion that the transactions occurred on a recognized market at standardized prices is based upon documentation consisting of a Yahoo! Finance printout of historical trading data from August 16 to October 14, 2012.

Rothstein argues that the fact that OTC Link (the trading platform) offers a feature where communications and trade negotiations can occur between broker-dealers with respect to a possible private transaction in the shares of the common stock of a publicly traded company does not cause OTCQB to cease to be a recognized market under the UCC. Private parties, whether individuals, companies, or broker-dealers always have the ability to negotiate private transactions outside a recognized market. That occurs daily, most frequently when either the size of a proposed transaction is so great that it could disrupt the trading on a recognized market, or where the buying party seeks a price below the prevailing price on the recognized market. However, that is not what occurred with the Infinity shares at issue here. The limit orders sold in lots by Rothstein are consistent with public trading on the NYSE.

Although the Court rejects the ultimate legal conclusions offered by Rothstein's expert Underwood, the Court finds that he has substantial experience with trading on the various securities markets, including the OTC markets. The Court finds his factual statements as to how the OTCQB works and how the Infinity securities were traded on that market useful in its analysis. The Court further finds that his factual statements and explanations support the conclusion that the Infinity shares at issue were sold at standardized prices and the sale of those shares was not the subject of individual negotiation. Ross has not offered any evidence to refute Underwood's statements that Rothstein's actual sales of the Infinity shares (in six lots) at issue here were not the subject of individually negotiated transactions.

The Court therefore finds that the Infinity shares sold by Rothstein on September 16, 2013 were sold at standardized prices and the sales of the lots of shares were not the subject of individual negotiation. Even if, as Ross has suggested, it is possible for sales of OTCQB securities to be individually negotiated, this is just one option for a broker-dealer to execute a trade order. Trading securities on the OTCQB is sufficiently similar to trading on a "recognized market" like the New York Stock Exchange, which is cited as an example of a "recognized market" in Comment 9 to K.S.A. 84–9–610, so as to conclude that it is a "recognized market" for purposes of determining the commercial reasonableness of a collateral disposition under UCC Article 9.

The Court thus concludes that the OTCQB is a "recognized market" and

---

54. *Id.*

55. Underwood Aff. ¶ 41.

Rothstein's sale of the Infinity stock on the OTCQB was therefore commercially reasonable under K.S.A. 84-9-627(b). The Court finds this conclusion is further supported by the undisputed fact that the OTCQB is the only place where Infinity's common stock has been publicly traded or sold, and by a reference to the OTCQB on the Securities and Exchange Commission's ("SEC") website. In an answer to a question inquiring when a company may file a registration statement for the resale by the investors of securities sold in a private equity line financing, the official SEC answer includes the following statement:

> We will not object that a private transaction is not "completed" based on the lack of a fixed price if the agreement provides for pricing based on a formula tied to market price and there is an existing market for the securities as evidenced by trading on a national securities exchange *or through the facilities of the OTC Bulletin Board or the OTCQX or OTCQB marketplaces of OTC Link ATS.* [May 16, 2013].[56]

From this reference, the SEC appears to recognize OTCQB as a marketplace for the purpose of determining the public market price when issuers are raising capital.

In addition to arguing that his disposition of the Infinity shares was commercially reasonable under K.S.A. 84-9-627(b)(1), Rothstein also argues that it was commercially reasonable under K.S.A. 84-9-627(b)(2) and (b)(3). Because the Court concludes that the OTCQB is a "recognized market" under subsection (b)(1), it need not address whether Rothstein has satisfied the other two subsections by which he can show that his disposition of the collateral was commercially reasonable.

The Court thus finds that Rothstein has sufficiently proven that his disposition of the 77,310 shares of Infinity common stock was conducted in accordance with the provisions of Part 6 of Kansas UCC Article 9. He is thus entitled to summary judgment in his favor on Ross's claim for wrongful disposition of collateral and a deficiency damages determination and award.

### C. Attorney's Fees
#### 1. Whether Rothstein is Entitled to Attorney's Fees

Rothstein requests that the Court determine and order that he is entitled to recover from Ross the reasonable attorney's fees and expenses he incurred, the amount ultimately to be determined through a fee application under Fed.R.Civ.P. 54 and D. Kan. Rule 54.2. He argues that Ross agreed in the parties' Loan Documents to pay Rothstein's attorney's fees and expenses incurred in not only enforcing Rothstein's loan rights and security interest, but also in defending against Ross's claims and contentions.

Paragraph 11 of the Secured Promissory Note provides for the payment by Ross of all costs of collection in the event of default:

> 11. **Collection Fees.** Except as otherwise provided herein, the Maker [Ross] shall pay all costs of collection, including reasonable attorneys' fees and all costs of suit and preparation for such suit (and whether at trial or appellate level), in the event the unpaid principal amount of this Note, or any payment of Interest is not paid when due, or in case it becomes necessary to protect the security for the indebtedness evidenced hereby, or for the foreclosure of trustee's sale by the Holder under the Pledge Agreement

**56.** U.S. Securities and Exchange Commission, Questions and Answers of General Applicability, Question 139.13, http://www.sec. gov/divisions/corpfin/guidance/sasinterp.htm (last visited Dec. 17, 2014) (emphasis added).

or in the event the Holder is made party to any litigation because of the existence of the indebtedness evidenced by this Note, or ... to preserve, protect or realize upon any security for, or guarantee or surety of, such indebtedness whether suit be brought or not, whether through courts of original jurisdiction, as well as in courts of appellate jurisdiction, or through a bankruptcy court or other legal proceedings.

Paragraph 14 of the (Superseding) Pledge Agreement also requires Ross to pay all reasonable out-of-pocket costs and expenses incurred by Rothstein in connection with, among other things, any matters arising out of the parties' Loan Documents, including fees and expenses incurred in defending Rothstein against Ross' claims:

14. *Expenses.* Pledgor [Ross] shall promptly pay to Pledgee [Rothstein] all reasonable out-of-pocket costs and expenses of Pledgee (both before and after the execution hereof) in connection with protecting or perfecting Pledgee's security interest in the Pledged Collateral or in connection with any matters contemplated by or arising out of this Pledge Agreement, the Forbearance Agreement or the Note, whether (i) to prepare, negotiate or execute any amendment to, modification of or extension of this Pledge Agreement, the Forbearance Agreement or the Note; (ii) to commence, defend, or intervene in any litigation or to file a petition, complaint, answer, motion or other pleadings necessary to protect the rights of Pledgee under this Pledge Agreement, the Forbearance Agreement or the Note; (iii) to take any other action in or with respect to any suit or proceeding (bankruptcy or otherwise) necessary to protect the rights of Pledgee under this Pledge Agreement, the Forbearance Agreement and the Note; (iv) to protect, collect, sell, take possession of, release or liquidate any of the Pledged Collateral; or (v) to attempt to enforce any rights of Pledgee to collect any of the secured Obligations, including all reasonable fees and expenses of attorneys and the allocated costs of internal counsel and paralegals, and in the case of enforcement, pay such reasonable costs and expenses for Pledgee.

Ross does not dispute that he is obligated by these contractual provisions to pay the reasonable out-of-pocket costs and expenses incurred by Rothstein in connection with enforcing his rights under the Agreement. The Court determines that Rothstein is entitled to recover his reasonable out-of-pocket costs and expenses, including attorney's fees, as provided in paragraph 14 of the (Superseding) Pledge Agreement. Determination of that reasonable amount shall be made pursuant to the fee application process set out in Fed.R.Civ.P. 54(d)(2) and D. Kan. Rule 54.2.

Accordingly, for the foregoing reasons, the undersigned Magistrate Judge recommends that Defendant Adam Rothstein's Motion for Summary Judgment as to Plaintiff's claim for Wrongful Disposition of Collateral, Rothstein's Right to a Deficiency Damages Award, and Entitlement to Attorney's Fees be granted. It is recommended that summary judgment on Ross's wrongful disposition of collateral claim should be entered in favor of Rothstein and a deficiency damages determination and award entered. It is further recommended that Rothstein is entitled to recover his reasonable out-of-pocket costs and expenses as provided in paragraph 14 of the (Superseding) Pledge Agreement with the reasonable amount determination made pursuant to the fee application process set out in Fed.R.Civ.P. 54(d)(2) and D. Kan. Rule 54.2.

### D. Fraud in the Inducement Counterclaim

Ross also requests in his motion that the Court enter summary judgment in his favor on Rothstein's counterclaim for fraud in the inducement. He argues that Rothstein is not able to prove each and all of the elements of his counterclaim by the quantum of clear and convincing evidence required under Kansas law. In response, Rothstein argues that Ross's motion should be denied as untimely filed, as it was filed more than seven months after the deadline for filing such motion.

#### 1. Timeliness of Ross's Motion

In his Memorandum in Opposition, Rothstein argues that Ross's motion for summary judgment on the fraud in the inducement counterclaim should be denied as untimely because Ross failed to file the motion by the January 10, 2014 deadline for filing such motions, or to seek an extension of time to file it. Notably, in his Reply, Ross chooses not to argue over whether his motion was untimely filed and makes no attempt to show good cause for not filing the motion by the initial dispositive motions deadline on January 10, 2014 (when Rothstein filed his summary judgment motion on all claims other than those related to Ross's wrongful disposition claim). Instead, Ross argues simply that "even if" the motion was untimely filed:

> [T]here is no reason to preserve a claim for trial which Rothstein is demonstrably unable to prove by the standard of clear and convincing evidence required and where it even now appears that Rothstein has suffered no damages from any alleged "fraud," having already received $345,220.99 upon a nine-month loan of $210,000.[57]

The Court finds that Ross's July 17, 2014 motion for summary judgment on Rothstein's fraud in the inducement claim is indeed untimely. The deadline to file the motion was January 10, 2014. Ross offers no excuse nor does he make a showing of excusable neglect for his failure to timely file his motion seeking summary judgment on the fraud claim.[58] Having filed his motion six months after the January 10, 2014 deadline, it is not enough for Ross to argue simply that he should prevail on the merits of summary judgment while ignoring entirely his significant delinquency.

Fed.R.Civ.P. 56(b) permits the filing of a motion for summary judgment "at any time until 30 days after the close of all discovery," unless a different time is set by local rule or court order. In this case, on May 22, 2013, the Court entered the original Scheduling Order (ECF No. 20), which set a January 10, 2014 deadline for the parties to file potentially dispositive motions such as motions for summary judgment. Thereafter, in its December 20, 2013 Amended Scheduling Order (ECF No. 114), the Court granted Ross's motion for leave to amend his complaint to add his claim for wrongful disposition of collateral and set a March 28, 2014 deadline for "filing any new dispositive motion on the new claim." On December 30, 2013, Rothstein filed an unopposed motion seeking to clarify and extend the January 10, 2014 deadline for filing a dispositive motion as to a "deficiency" determination. The Court granted that motion and extended the deadline for filing any dispositive motion *relating to Rothstein's claim for a deficiency damages award or judgment* to March 28, 2014.[59] Rothstein timely filed

---

**57.** Pl.'s Reply (ECF No. 280) at 45.

**58.** The applicable legal standard for evaluating Ross's failure to timely file his motion is excusable neglect. *See* Fed.R.Civ.P. 6(b)(1)

(the court may extend the time "on motion made after the time has expired if the party failed to act because of excusable neglect").

**59.** ECF No. 130 (emphasis added).

his second motion for partial summary judgment on Ross's defamation claim by the January 10, 2014 deadline (ECF No. 132). The March 28 deadline for dispositive motions only as to Ross's wrongful disposition claim and/or Rothstein's claim for deficiency damages was ultimately extended to July 17, 2014 by subsequent Court orders. But, those Court orders for extensions occurred after the deadline for filing dispositive motions for all other claims had already expired and did not revive or re-open that earlier deadline. Ross did not seek any extension of the January 10, 2014 deadline and his motion for summary judgment filed on July 17, 2014 on Rothstein's fraud in the inducement counterclaim is therefore untimely.

## 2. Merits of the Motion

■ Even were the Court inclined to excuse the untimeliness of Ross's motion, the Court finds that genuine issues of material fact prevent summary judgment as to Rothstein's counterclaim against Ross for fraud in the inducement. To prevail on his claim for fraudulent inducement, Rothstein must prove by clear and convincing evidence that (1) Ross made an untrue statement of existing material fact, (2) Ross knew that the statement was untrue or recklessly made with disregard for the truth, (3) Ross made the statement with the intent to induce Rothstein to act on the statement, (4) Rothstein justifiably relied on the statement to his detriment, and (5) Rothstein sustained injury as a result of his reliance.[60]

■ The standard of proof where fraud is alleged is that of "clear and convincing evidence."[61] This standard means that a plaintiff must not only prove his cause by a preponderance of the evidence, but its evidence must be of a higher quality.[62] The phrase "clear and convincing" signifies:

[T]he witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue.[63]

The Court finds that there is a genuine dispute as to material facts with respect to Rothstein's fraud in the inducement claim. Specifically, factual issues exist as to whether Ross made untrue statements in his conversations with Rothstein leading up to Rothstein agreeing to make the $210,000 loan to Ross on March 29, 2012 (such as the statement that he was about to close on a financing, and that he had "other assets"). Factual issues also exist as to whether Ross concealed and/or failed to disclose certain material financial matters[64] (such as the $500,000 in IRS tax liens outstanding at the time of the loan at issue that would consume any back pay he was expecting from Infinity, and that board approval would be required before any payment of back pay). These factual issues preclude entry of summary judgment on the fraud in the inducement claim.

**60.** *BHC Dev., LC v. Bally Gaming, Inc.*, 985 F.Supp.2d 1276, 1288–89 (D.Kan.2013) (citing *Stechschulte v. Jennings*, 297 Kan. 2, 298 P.3d 1083, 1096 (2013); PIK Civ. 4th 127.40).

**61.** *Nordstrom v. Miller*, 227 Kan. 59, 65, 605 P.2d 545, 552 (1980).

**62.** *Fox v. Wilson*, 211 Kan. 563, 579, 507 P.2d 252 (1973).

**63.** *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 78, 596 P.2d 816, 824 (1979).

**64.** The Court is making no determination whether Ross had a legal duty to disclose this information, or whether Rothstein actually relied on the alleged fraudulent misrepresentations or failure to disclose.

Accordingly, for the foregoing reasons, the undersigned Magistrate Judge recommends that Ross's Motion for Summary Judgment Upon his Claim Against Defendant for Wrongful Disposition of Collateral Under K.S.A. 84–9–624 and 9–626 and Upon Defendant's Counterclaim for Fraud in the Inducement be denied. It is recommended that summary judgment on Ross's wrongful disposition of collateral claim should be entered in favor of Rothstein. It is further recommended that Ross's motion for summary judgment on Rothstein's fraud in the inducement claim be denied as untimely filed and because genuine factual issues exists that preclude summary judgment.

### RECOMMENDATIONS

IT IS THEREFORE RECOMMENDED THAT Plaintiff's First Motion for Order in Limine Excluding all Facts, Evidence, Testimony, Opinions and Inferences Offered by Defendant's Proffered Expert, Attorney Brian C. Underwood (ECF No. 261) be GRANTED IN PART AND DENIED IN PART. Underwood should be precluded from offering at trial the four expert opinions set forth in his Affidavit. The Court also disregards Underwood's four legal opinions asserted in his Affidavit in ruling on the pending cross motions for summary judgment. The Court will, however, consider the factual information provided by Underwood in his Affidavit, particularly as to the OTC markets and the OTCQB in particular, in making its own legal conclusions.

IT IS FURTHER RECOMMENDED THAT Defendant Adam Rothstein's Motion for Summary Judgment as to Plaintiff's claim for Wrongful Disposition of Collateral, Rothstein's Right to a Deficiency Damages Award, and Entitlement to Attorney's Fees (ECF No. 252) be GRANTED. It is recommended that summary judgment be entered in favor of Rothstein on Ross's wrongful disposition of collateral

claim. It is further recommended that upon adoption of this Report and Recommendation, the District Judge set an evidentiary hearing to determine the amount of the deficiency judgment. It is further recommended that Rothstein is entitled to recover his reasonable out-of-pocket costs and expenses as provided in paragraph 14 of the (Superseding) Pledge Agreement, with the amount to be determined pursuant to the fee application process set out in Fed.R.Civ.P. 54(d)(2) and D. Kan. Rule 54.2.

IT IS FURTHER RECOMMENDED THAT Plaintiff's Motion for Summary Judgment Upon his Claim Against Defendant for Wrongful Disposition of Collateral Under K.S.A. 84–9624 and 9–626 and Upon Defendant's Counterclaim for Fraud in the Inducement (ECF No. 255) be DENIED. It is recommended that Ross's motion for summary judgment on Rothstein's fraud in the inducement claim be denied as untimely filed and because genuine factual issues exists that preclude summary judgment.

Respectfully submitted.

Dated in Kansas City, Kansas on this 23rd day of December, 2014.

**Pamela L. STEAD, Plaintiff,**

v.

**UNIFIED SCHOOL DISTRICT NO. 259, SEDGWICK COUNTY, KANSAS; and John Allison, individually and in his official capacity, Defendants.**

**Case No. 13–cv–1378–DDC–JPO.**

United States District Court,
D. Kansas.

Signed March 13, 2015.

M. Kathryn Webb, Law Office of M. Kathryn Webb, Wichita, KS, for Plaintiff.

Andrew T. Geren, Richard W. James, Devaughn James, LLC, Wichita, KS, for Defendants.

## MEMORANDUM AND ORDER

DANIEL D. CRABTREE, District Judge.

Plaintiff Pamela Stead brings this lawsuit asserting various causes of action arising from defendants' conduct investigating, publicizing, and responding to allegations of improprieties during the administration of Kansas state assessment tests. These events ultimately led to plaintiff's resignation as principal of Enterprise Elementary School, part of Unified School District 259 in Wichita, Kansas. This matter comes before the Court on defendants USD 259 and Superintendent John Allison's Motion for Summary Judgment (Doc. 99). Plaintiff has filed a response (Doc. 115), and defendants have filed a reply (Doc. 116). After reviewing the arguments and evidence submitted by the parties, the Court grants defendants' motion for summary judgment for the reasons explained below.

## I. Procedural Background

■ Plaintiff filed this action on September 11, 2013, in the District Court of Sedgwick County, Kansas (Doc. 1–1). Plaintiff's Complaint asserts 11 causes of action: (1) defamation (libel and slander); (2) false light invasion of privacy; (3) negli-

gence; (4) breach of contract; (5) breach of the implied covenant of good faith and fair dealing; (6) intentional interference with contract and prospective business advantage; (7) intentional infliction of emotional distress; (8) negligent infliction of emotional distress; (9) fraudulent inducement; (10) negligent misrepresentation; and (11) deprivation of civil rights under 42 U.S.C. § 1983 (specifically, deprivation of procedural and substantive due process். On October 8, 2013, defendants filed a Notice of Removal (Doc. 1), invoking this Court's jurisdiction over federal questions under 28 U.S.C. § 1331 and its supplemental jurisdiction over pendant state law claims under 28 U.S.C. § 1367(c). Plaintiff did not seek remand. Nevertheless, the Court has considered whether it should exercise jurisdiction over all of plaintiff's claims, see 1mage Software, Inc. v. Reynolds & Reynolds Co., 459 F.3d 1044, 1048 (10th Cir.2006) ("[f]ederal courts have an independent obligation to determine whether subject-matter jurisdiction exists"), and concludes that this case is properly within its federal question and supplemental jurisdiction.

## II. Uncontroverted Facts

The following paragraphs set forth the facts material to defendants' summary judgment motion. These facts are either uncontroverted by the parties or are viewed in the light most favorable to plaintiff, the non-moving party.[1]

---

1. Defendants submitted the "Affidavit of Robert Winkler" (Def. Ex. D (Doc. 100–5)) as an exhibit to the memorandum in support of their summary judgment motion. Mr. Winkler's affidavit reflects that it was sworn ·in Sedgwick County, Kansas before Joshua K. Westmoreland, a notary public. However, the notary seal affixed to the affidavit identifies Mr. Westmoreland as a notary public commissioned by the state of Colorado. Plaintiff asserts that the affidavit is therefore "invalid and should not be considered as evidence" because Mr. Westmoreland's powers

(Doc. 116–5). As a result, where the alleged invalidity of Mr. Winkler's affidavit is the sole basis for plaintiff controverting a statement of fact, the Court deems that fact uncontroverted for summary judgment purposes.